297 So.2d 518 (1974)
The STATE of Louisiana ex rel. William J. GUSTE, Jr., Attorney General
v.
The COUNCIL OF the CITY OF NEW ORLEANS and New Orleans Public Service, Inc.
No. 6121.
Court of Appeal of Louisiana, Fourth Circuit.
May 17, 1974.
Rehearings Denied August 1, 1974.
Writs Granted October 4, 1974.
*519 William J. Guste, Jr., Atty. Gen., Louis A. Gerdes, Jr., Robert L. Danner, Jr., New Orleans, for plaintiff-appellant.
Chaffe, McCall, Phillips, Toler & Sarpy, Harry McCall, Jr., Blake G. Arata, City Atty., David S. Cressy, New Orleans, for defendants-appellees.
Monroe & Lemann, Andrew P. Carter, Eugene G. Taggart, H. Sloan McCloskey, New Orleans, for intervenor.
Before BOUTALL, MORIAL and BOURG, JJ.
MORIAL, Judge.
Two issues are to be determined in this case: (1) is a ten (10%) percent increase charged by the New Orleans Public Service, Inc. (NOPSI) on a utility bill paid after the due date, which is ten (10) days subsequent to the rendition of the bill, a rate or interest in violation of the eight (8%) percent limitation fixed by LSA-R. C.C. Article 2924? and (2) is it legal for NOPSI in computing the "gross total" due to apply the three (3%) percent city tax[1] to the ten (10%) percent increase charged late ratepayers for gas and/or electricity consumed?
The Council of the City of New Orleans under the authority of Section 4-1604 of the City Charter on November 22, 1972 adopted a resolution fixing and establishing increased rate schedules for gas and electric service consumers in the City of New Orleans. NOPSI provides gas and electric service to all wards in the City except the Fifth Municipal District (Algiers) where such service is provided by Louisiana Power & Light Company (LP& L), intervenor herein. LP&L's billing and collection practices for its New Orleans customers are the same as NOPSI.
Each rate schedule that became effective on January 1, 1973 contained the following provision:
"PAYMENT
The net monthly bill calculated in accordance with the above rate will be increased *520 ten percent if payment is not made on or before the due date shown on the bill, which shall not be less than 10 days after it is rendered." (emphasis supplied)
In December 1972 the State of Louisiana, through William J. Guste, Jr., Attorney General of the State, acting as a representative of the consumer public at large and as a consumer of gas and electricity by state agencies located in New Orleans filed suit against the Council of the City of New Orleans and NOPSI. The state alleged that the ten percent increase in utility bills not paid on or before the due date as shown on the bill is in violation of Louisiana law in that this additional charge is interest in excess of the rate of interest permitted by LSA-R.C.C. Article 2924. Plaintiff further alleged that NOPSI and the City of New Orleans were in violation of the Louisiana Unfair Trade Practices and Consumer Protection Law, LSA-R.S. 51:1401 et seq., and prayed for a preliminary injunction.
The learned district judge correctly held that pursuant to LSA-R.S. 51:1406 NOPSI and LP& L are exempt from the provisions of the Unfair Trade Practices and Consumer Protection Law. NOPSI and LP&L are also exempt from the provisions of the Louisiana Consumer Credit Law, LSA-R.S. 9:3510 et seq. The district court properly denied injunctive relief. LSA-C.C.P. 3601.
After a hearing on plaintiff's petition, the district court dismissed plaintiff's suit and rendered judgment in favor of defendants and intervenor. The district court concluded that the late payment charge is simply a practical method of preventing discrimination among NOPSI's customers and stated:
"The 10% charge is plainly designed to allocate to the customers responsible therefor, the various items of cost resulting from the late payment of utility bills."
The district court further found that the late payment charge assessed by NOPSI and LP&L is a vital part of the basic rate making structure and under no circumstances could it be classified "interest as damages for nonpayment of money." and also that NOPSI is obligated to collect the city tax on whatever amount is paid.
The case is before us on the State's appeal. NOPSI's brief was adopted by the Council of the City of New Orleans. It is not without a meticulous reading of the record and the jurisprudence we deem applicable that we reverse the judgment of the district court.
Generally rates are established by utilities to cover the cost of service, including operating expenses and other deductions from gross revenues, as well as a fair return to the owners of the property on their investment.[2] Included in a rate design scheme is the question of the right and amount a utility may charge as a late fee for a failure to pay promptly or at a given time.
Defendant NOPSI argues that the ten (10%) percent additional charge is merely a rate differential used by it to offset additional expenses incurred in and attributable to the processing of delayed, delinquent and uncollectable accounts, and charges such additional expenses to the customers responsible for them. NOPSI also argues that the "late charge" is an inducement to customers to pay bills promptly. A "penalty", "added charge", or "discount" as used by many utilities across the United States may constitute a rate differential established to induce customers to pay promptly.[3]
It was stipulated by counsels at the hearing that NOPSI collected $1,006,910 for *521 the test year ending May 31, 1972 from the assessment of the ten (10%) percent charge to late ratepayers.
Michael Burns, manager of NOPSI's Customer Accounting Division, testified with reference to the cost allocation for the assessment as it related to a 12 month period ending July 31, 1972.
Q. Mr. Burns, have you seen the evidence that has been stipulated, that $1,006,910 is the amount realized by New Orleans Public Service for the year stated?
A. Yes sir, I have.
Q. And that's collected for the 10 percent late penalty for the year ending May 31, 1972?
A. To the best of my knowledge, that's correct.
Q. Has NOPSI made a compilation of the total use cost as a result of the tardiness or payment represented in this figure?
A. Not to my knowledge of May 31, 1972. I have a figure as of July 31, 1972, for the 12 months ending the year 1972.
Q. What costs were used in this figure to total the cost figure? What were the components of the cost?
A. I'll try to remember them. I may leave one or two out. There were costs involved in collecting overdue accounts in the field, cost involved in reconnecting service that was terminated because of nonpayment, cost associated with the uncollectible accounts, costs associated with the maintenance of the customer security deposit. (emphasis supplied)
There may have been a few others. Without the actual papers in front of me I don't remember all the rest but there probably were several others.
* * * * * *
Q. Referring back now, Mr. Burns, to the statement that you had compiled a figure for certain costs ending July '72, you mentioned bad debts, and you said there was a figure that you arrived at, the cost for the utility company's total bad debts. Was the figure overall to yearly income, the bad debt accounts?
A. I do not know.
Q. You do have a figure for the total year, do you not, for July ending `72?
A. I believe I do.
Q. Would you please give it and, if you wouldn't mind, please state what the figure is a total of.
A. This is an unaudited figure, if you will, but for the 12 months ending July 31, 1972, our uncollectible accounts were, and by "uncollectible accounts" I mean the amount of service billings after any applicable deposit or interest was applied to those billings, and that was approximately $218,000. (emphasis supplied)
THE COURT:
And that's gas and electric?
THE WITNESS:
Yes, sir.
EXAMINATION BY MR. VALLE:
Q. Do you havethat was the total figure broken down to four components, was it not?
A. No.?
Q. May we refer back to that, please?
A. I don't have the other figures broken down individually.
Q. Give us the total figure, then.
*522 THE COURT:
Would this be for the four or three?
THE WITNESS:
That would be the one figure for uncollectible accounts. The next new figure would be those four plus any of the others that I was unable to remember. Again, this is an unaudited figure, and I just jotted it down. For the 12 months ending December 31, 1972, total expenses, if you will, $1,026,900. Total revenue or receipts from the delayed payment charges and reconnection charges, $1,031,610. The difference being approximately $4,710. (emphasis supplied)
THE COURT:
What does the difference represent?
THE WITNESS:

The difference represents revenue in excess of actual cost and, of course, all these figures are estimated revenue or estimated costs for the 12 months ending July 31, 1972, and this figure, of course, changes every month as the revenue and cost change. (emphasis supplied)
* * * * * *
EXAMINATION BY MR. VALLE:
Q. Mr. Burns, previously in your testimony you gave us a figure, $281,000, which you said was for the 12 month period ending July 31, 1972, for uncollectible accounts, did you not? (emphasis supplied)
A. Yes, sir. (emphasis supplied)
Q. You said that was an unaudited figure?
A. Yes, sir.
Q. What is it based on? (emphasis supplied)
A. This is the total amount of bills that have remained unpaid for 90 days less any deposit or interest applicable to those bills for the 12 months ending July 31, 1972. (emphasis supplied)
Q. Does this mean that service has been terminated for these accounts? (emphasis supplied)
A. That's correct. (emphasis supplied)
Q. There was another figure that you gave, the total figure for the year ending July, 1972. What was that amount again?
A. You're speaking of a figure, $1,026,900?
Q. Yes, sir.
A. That was
MR. MC CALL:
That was December.
THE COURT:
Sothat's through July 31, 1972, one year, and that takes all of them in?
THE WITNESS:
Right.
EXAMINATION BY MR. VALLE:
Q. The $1,026,900 figure? (emphasis supplied)
A. That was the total of all the four items that we specifically mentioned and any others to be included that I couldn't remember exactly. (emphasis supplied)
Q. These four items are the deposit?
A. Right.
Q. And the bad debts?
A. Right.
Q. And the disconnecting charge and the collection charge?
A. Right.
Q. And there may be some others? (emphasis supplied)
A. Right. (emphasis supplied)
*523 Mr. Burns further testified that the company charges $1.50 for reconnecting service that has been cut off due to nonpayment. (The $1,006,910 is exclusive of any collections of this charge.) Therefore, the costs of reconnection, or at least a portion of it, are covered by a charge to those persons whose service is cut off and subsequently reconnected.
Insofar as uncollectible accounts are concerned, the testimony in the record is unclear. However, we take judicial notice of a common practice. 31 C.J.S. Evidence § 29, p. 905. Each person desiring gas or electric service from NOPSI makes a cash deposit before service is obtained. This deposit, by the terms of the deposit certificate, is credited toward any amount owed for service at the time service is discontinued.
Mr. Burns testified that the company has been using the security deposit at least since 1920 as a method of defraying the cost incurred from nonpayment. He testified that prior to 1971 the company required a $5.00 deposit for electricity and $5.00 for gas. In February 1971 the deposit was raised to its present level of $15.00 for electricity and $10.00 for gas. Mr. Burns testified:
Q. Do you know the reason why the company changed the policy, what the intent was?
A. The primary intent was to enable us to decrease the amount of uncollectable accounts by offsetting them by the higher deposit. (emphasis supplied)
Q. You are referring just to that class of customers who do not pay at all.
A. That's correct.
It is abundantly clear from the "record before us that the customers who are in the class of late ratepayers are being assessed a charge for those customers who never pay.
This record does not substantiate a conclusion that the costs of reconnecting service because of nonpayment, uncollectible accounts (bad debts), and maintenance of the security deposit result directly from customers who are tardy and pay on the eleventh day or thereafter after rendition of a bill. Though late they nevertheless pay. There is no relationship between costs of uncollectible accounts and expenses related to past due accounts.
NOPSI relies on Coffelt v. Arkansas Power & Light Company, 248 Ark. 313, 451 S.W.2d 881 (1970), in support of its argument that the ten (10%) percent late charge is not interest and therefore not within the purview of the Louisiana prohibition against usury. In Coffelt there was the imposition of a charge of 8% of the first $15.00 net bill and 2% of any amount in excess of $15.00 against customers who did not pay their monthly bills within ten (10) business days after due date.
The Arkansas Supreme Court held that the charge did not violate the state's prohibition against usury in that the late charge was not interest but a device by which customers are automatically classified to avoid discrimination and to require delinquent ratepayers to bear as nearly as can be determined, the exact collection costs resulting from their tardiness in paying their bills.
State of North Carolina ex rel. Utilities Commission et al. v. North Carolina Consumers Council, 18 N.C.App. 717, 198 S. E.2d 98 (1973) cited by defendants simply holds in conformity with Coffelt; State ex rel. Model Water and Light Co. v. Department of Public Service of Washington, 199 Wash. 24, 90 P.2d 243 (1939) also cited by defendants, is an earlier pronouncement of the historically accepted rule sanctioned by the language of Coffelt.
Such is not the situation here. To the sum collected by NOPSI for late payments has been assigned costs, i. e., reconnecting service because of nonpayment, uncollectible *524 accounts and maintenance of the security deposit, not directly attributable to late ratepayers. Customers who are responsible for those enumerated costs should be made to pay them.
It is too elementary to warrant citation that a utility rate design has a cardinal feature the assignment of specific charges to a class of customers such that total revenue received will equal the costs incurred in providing services to the customers within the class. This method is employed to prevent discrimination among the customers of a utility company. The prohibition against discrimination in utility rates is basic in public utility law.[4]
Rather than employ a rate to avoid discrimination among NOPSI's customers, the tariff granted by the City of New Orleans permits NOPSI to discriminate against late ratepayers by allowing NOPSI to attribute to the class of ratepayers costs for which they are not to be held accountable.
It is correct that a customer becomes a late payer prior to his bill becoming uncollectible, his service disconnected and, if he chooses, subsequently reconnected. For such class of customers, the security deposit and the reconnecting charge should be in an amount adequate to bear those costs.
This record points out that NOPSI has not adequately isolated its costs of collection from late ratepayers. Within its class of late ratepayers NOPSI includes those who never pay (uncollectible accounts) and customers who have service reconnected after disconnection of service thus compelling late ratepayers to subsidize too substantial a portion of the costs to NOPSI of uncollectible accounts (bad debts) and costs of reconnection. There is a sufficient disparity within the NOPSI class of late ratepayers to render the NOPSI late charge unjust discrimination and impermissible as a rate within a utility rate design scheme. Accordingly, we are constrained to conclude that the NOPSI "late charge" is in fact not a utility rate.
NOPSI further contends that the ten (10%) percent late charge is allowable as a "time-price differential." A "time-price differential" is a legitimate method by which a seller charges one price for immediate cash payment and a different (advance in) price when payment is made at a future date or in installments. The former is the cash price and the latter the "time-price" or the credit price and the difference (advance) in price is the "time-price differential." General Electric Credit Corporation v. Lunsford, 209 Va. 743, 167 S. E.2d 414 (1969).
Defendants argue that the essence of the "time-price differential" is the option afforded a customer at the time of sale, i. e., to pay the cash price or defer payment and pay the credit or time-price, and contend that a NOPSI utility customer has this option and makes an election when the choice is exercised to pay the "net total" on or before the due date, or the "gross total" after the due date.
Dendinger, Inc. v. Emuy & Eichhorn, 12 La.App. 39, 124 So. 604 (La.App., Orl. 1929) speaks of a "time-price differential."
In Dendinger. the plaintiff sold defendant lumber, for the contract price of $1,775.38, the contract contained, among others, the following stipulation, "* * * net to the last day of the month following, when, if not paid 10% will be added to the above price." The Dendinger court concluded the addition to the price was a penalty for delay in payment and interest within LSA-R.C.C. Article 1935. It distinguished Dendinger from Robbins v. W. W. Page & Son et al., 10 La.App. 207, 120 So. 683 (2 Cir. 1929), Hogg v. Ruffner, 1 Black (66 U.S.) 115, 17 L.Ed. 38, Mills v. Crocker, 9 La.Ann. 334 (1854) and other *525 cases to the effect that a vendor may charge an amount greater than the highest conventional rate of interest permitted by law, for an article sold on credit, above what would have been charged had the sale been for cash. The court said, 124 So. at page 605:
"* * * In all of the cited cases the question presented involved an increase in the selling price of an article because of the credit extended. In the case before us the 10 per cent. increase in the price is dependent upon the delay in payment, and is independent of the fact that the lumber was sold on credit. It seems clearly to impose an additional penalty for failure to pay by the `last day of the month following,' and in that sense comes within the codal definition of `interest' (C.C. art. 1935), as damages due for the delay in the performance of an obligation to pay money. For example, if the purchase price had been met the day before the last day of the month following, no penalty would have been due, but, if paid one day later an additional sum of $177.54 would, under the terms of the contract, be payable. In fact, interest at the rate of 10 per cent. for one day would have been imposed. * * *"
In addition to Robbins v. W. W. Page & Son et al., supra, defendant NOPSI cites General Motors Acceptance Corporation v. Swain, 176 So. 636 (La.App. 1 Cir. 1937); Borel v. Living, 28 So.2d 392 (La.App. 1 Cir. 1946); Motes v. Van Wagner, 188 So.2d 704 (La.App. 4th Cir. 1966) and Commercial Credit Equipment Corporation v. Larry Parrott of Gueydan, Inc., 212 So. 2d 860 (La.App. 3 Cir. 1968) in support of its argument that the NOPSI "late charge" is a "time-price differential" and has the jurisprudential imprimatur of our state. The cited cases are indistinguishable from the cases distinguished in Dendinger. A classic distinction is made between the "late charge" found in Dendinger and a "time-price differential" in General Motors Acceptance Corporation v. Swain, supra, where in differentiating the two the court said:
"* * * It is clear in that case [Dendinger], and the court so held, that the 10 per cent. increase in the price was to be made on account of the delay in the payment of the fixed cash price, and for that reason was an attempt to impose a penalty for the nonpayment of an amount due, which constituted the 10 per cent. interest. But in this case, the cash price was not agreed upon as the terms of the sale, but the credit or time price was fixed by the parties in their contract as the amount to be paid for the car. This they had a right to do. * * *" 176 So. at page 638.
The payment provision of the rate design scheme approved by the City of New Orleans unmistakingly provides for an additional charge for a failure to pay on or before the "due date." it does not, as in the cases cited by learned counsels for defendants and intervenor allow for the difference between a cash price or credit price; it does not grant an advance in price over what would be charged in the case of a cash sale; it does not grant a utility customer a "discount" when the "net total" is paid on or before the due date.
Howsoever denoted by NOPSI, i. e., "time-price differential," "discount," or "gross total," by the terms of the "Payment" section of the tariff, the ten (10%) percent increase, is the price paid by the customer for the time use of money calculated on the amount charged the ratepayer for NOPSI's regular service computed in accordance with the service section(s) of its tariff.
If payment is made on or before the due date which is ten days after a bill is rendered, the customer pays the "net total"; if payment is made one day or more after the due date, the "gross total" which includes the ten (10%) percent increase, is due and payable. Therefore, it is a penalty *526 for failure to pay at a designated time and is interest as defined in LSA-R.C.C. Article 1935:
"The damages due for delay in the performance of an obligation to pay money are called interest. The creditor is entitled to these damages without proving any loss, and whatever loss he may have suffered he can recover no more."
Interest at the rate of ten (10%) percent is imposed for one day or for any number of days computed from the due date which is ten (10) days after the utility bill is rendered.
Our interest rate limitation is found at LSA-R.C.C. Article 2924 which provides:
"Interest is either legal or conventional. Legal interest is fixed at the following rates, to wit:
"* * * The amount of conventional interest cannot exceed eight per cent. * * *"
The rate of interest of the "late charge" assessed and collected by NOPSI exceeds eight (8%) percent per annum, the highest conventional rate which our law allows. NOPSI nor LP&L is exempt from the above interest rate limitation. Any agreement to pay a greater interest rate than (8%) percent per annum is null and void Green v. Johnson, 14 La.App. 110, 129 So. 384 (2 Cir. 1930).
The "Payment" section of the Resolution of November 22, 1972 of the Council of the City of New Orleans cannot pass muster. It is constitutionally infected by having exceeded the grant given to the City of New Orleans under the home rule provisions of the Louisiana Constitution. LSA-Const. Art. 14, § 22 prohibits the City from the "* * * exercise [of] any power or authority which is inconsistent or in conflict with any general law. * * *" The City is powerless to grant NOPSI and LP&L any right to charge and collect interest in excess of the rate limitation of LSA-R.C.C. Article 2924.
Each billing cycle NOPSI renders to its utility customers bills on which appear the designations "due date," "net total" and "gross total." On the total amount charged for service in accordance with the service section(s) of its tariff, NOPSI and LP&L compute and legally add three (3%) percent city tax to arrive at the "net total" due on or before the "due date." This practice is in conformity with the tax ordinance. However, to compute the "gross total" payable after the "due date," NOPSI and LP&L assess and collect the city tax on the illegal ten (10%) percent increase or "late charge" thereby assessing upon the illegal interest the city tax.[5] This NOPSI and LP&L cannot do.
The tax ordinance states, "* * * there is hereby levied on all consumers of gas and/or electricity within the City of New Orleans a tax on the amount each consumer is billed during any month by New Orleans Public Service, Inc., and Louisiana Power and Light Company for Gas/or electricity consumed at each service location, * * *." (emphasis supplied) NOPSI and LP&L can only assess and collect the city tax on the amount of gas and/or electricity consumed and billed in *527 accordance with the service section(s) of its tariff.
For the foregoing reasons the judgment of the district court is reversed. Defendants and intervenor are to equally share and pay all costs.
Reversed.
NOTES
[1] Ordinance No. 3972 M.C.S., December 30, 1968, as amended by Ordinance No. 4318 M.C.S., June 5, 1970, and Ordinance No. 4427 M.C.S., December 2, 1970, of the City of New Orleans provides:

"SECTION I. THE COUNCIL OF THE CITY OF NEW ORLEANS HEREBY ORDAINS, That, beginning the first service billing period for 1969, there is hereby levied on all consumers of gas and/or electricity within the City of New Orleans a tax on the amount each consumer is billed during any month by New Orleans Public Service, Inc. and Louisiana Power and Light Company for gas and/or electricity consumed at each service location, such tax to be on the following scale:
"(a) on the first $1,000.00 per month for gas and on the first $1,000.00 per month for electricity, 3% of the amount charged for each commodity furnished;
"(b) over $1,000.00 up to and including $4,000.00 per month for gas and over $1,000.00 up to and including $4,000.00 per month for electricity 1% for each commodity; and
"(c) that portion over $4,000.00 per month for gas and over $4,000.00 per month for electricity is exempted from the tax hereby imposed.
"SECTION II. That the amount of said tax shall be added to and constitute part of the bill sent to each consumer of gas and/or electricity by the said Companies, who shall collect said tax as agents for the City of New Orleans."
[2] Bonbright, Principles of Public Utility Rates, Columbia University Press (New York, 1961).
[3] Samuels, Warren J., Commentary: Utility Late Payment Charges, 19 Wayne L.Rev. 1151.
[4] Pond, Public Utilities, § 270, § 545, et seq. (4th ed., 1932).
[5] Michael P. Burns testified:

"The way its programmed is an amount that's charged for electric service is multiplied by 10 per cent. That resulting figure is in turn multiplied by three per cent. After this computation is made the amount charged for gas service is multiplied by 10 per cent and that resulting figure is multiplied by three per cent. Now, the same policy of rounding that I mentioned earlier applies here also. After the computations are made. The four figures then, the figure that represents 10 per cent of the electric charge, the figure that represents 10 per cent of the gas charge, the figure that represents three per cent of the 10 per cent for electricity and three per cent of the 10 per cent for gas having already been rounded or added together and that figure is added to the net total which is shown on the bill and becomes the gross amount." (Tr. pp. 34 and 35)