302 So.2d 358 (1974)
LOUISIANA POWER & LIGHT COMPANY
v.
Perrin W. WHITE and James M. Hill, Jr.
LOUISIANA POWER & LIGHT COMPANY
v.
CRESCENT PROPERTIES CO., INC.
Nos. 6261, 6262.
Court of Appeal of Louisiana, Fourth Circuit.
July 3, 1974.
Amended on Rehearing November 7, 1974.
Writs Refused March 7, 1975.
*360 Monroe & Lemann, New Orleans (Andrew P. Carter), New Orleans, for plaintiff-appellant.
Charles H. Ryan, Monroe, for defendants-appellants, Perrin W. White and James M. Hill, Jr., and defendant-appellee, Crescent Properties Co., Inc.
Before LEMMON, BOUTALL and SCHOTT, JJ.
SCHOTT, Judge.
These claims were brought by plaintiff, Louisiana Power & Light Company (LP&L) for balances due by defendants, Perrin W. White and James M. Hill, Jr. (White-Hill) and Crescent Properties Co., Inc. (Crescent), for electrical services furnished to them as successive owners of Elmwood Plantation Apartments (Elmwood).
In 1965 White-Hill constructed the east half of Elmwood, consisting of 142 units, to which electricity was furnished by LP&L on the basis of billings to the individual tenants through separate residential meters. Subsequently, White-Hill constructed the west half of Elmwood, consisting of 223 units where, at the request of White-Hill, electric service was furnished on the basis of a master meter and a billing made to White-Hill rather than to the individual tenants. On March 16, 1967. White-Hill formally requested that LP&L convert the system in the east half from the individual meters to a master meter at rates established for commercial accounts (LGS-5 tariff). LP&L refused that request, which was consistent with the position it had taken for several months of negotiations with White-Hill on the subject. A system had been installed wherein the individual tenants had assigned their accounts to White-Hill who received the monthly bills from LP&L for payment, but this was unsatisfactory to White-Hill. On April 20, 1967, White-Hill took the matter to the Louisiana Public Service Commission (LPSC) which, after due proceedings, on December 20, 1967, ordered that:
"Louisiana Power & Light Company serve the Elmwood Plantation Apartments with a system of master reading and on a commercial rate schedule."
In due course this order was affirmed by the Supreme Court in Louisiana Power & Light Company v. Louisiana Public Service Commission, 256 La. 656, 237 So.2d 673, the opinion becoming final on July 30, 1970. Against a backdrop of counter charges between the parties of failure to cooperate with the orders of LPSC and the Court, contempt proceedings against LP&L were initiated in October, 1970, in the 19th Judicial District Court for the Parish of East Baton Rouge, resulting in an adjudication of contempt against LP&L and its president. These proceedings were terminated on May 18, 1972, when the court found that these defendants had purged themselves of contempt.
On April 1, 1970, Elmwood was sold by White-Hill to Crescent. The claim against the former is for service furnished from January, 1968, until April 1, 1970, while the claim against the latter is for the period from April 1, 1970, to May 6, 1971.
*361 The suit against White-Hill was filed in March, 1970, and the balance sought was on the basis of residential rates through the individual tenant meters. However, alternative claims were made because of the litigation then pending in the Supreme Court for a sum based upon rates established by a tariff for a single master-metered primary service (MMRA-1 tariff) or a third alternative sum based upon the rates contained in the LGS-5 tariff. A preliminary default judgment was taken by LP&L in October, 1970, and despite an unsuccessful attempt by White-Hill to upset the preliminary default they filed declinatory and dilatory exceptions which included a plea of failure on the part of the plaintiff to make amicable demand since White-Hill had as early as March, 1968, informed LP&L that they were ready and willing to pay for the electrical service upon being billed the proper amount. LP&L countered with a motion to strike these exceptions based upon LSA-C.C.P. Art. 928. When the trial judge denied the latter motion and overruled White-Hill's exceptions, White-Hill filed their answer and a reconventional demand in January, 1971. By then the previous litigation had become final[1] and White-Hill alleged that they would pay for the electrical service on the basis of the LGS-5 rates. They prayed for an order requiring LP&L to render them a statement on that basis for service furnished to all 365 units of Elmwood between April, 1967, and April 1, 1970, subject to credits for payments made during that period; to submit such statement to them for review and verification; to allow a reasonable period of time for them to submit any objections which they might have; and to order them to pay the correct balance but without interest, penalties or court costs.
White-Hill also filed a peremptory exception of res judicata on the basis that with the finalization of the previous litigation it was now established that the master meter LGS-5 tariff was the proper basis for the assessment of charges, and that consequently the two alternative demands of LP&L, based upon the use of the residential tariff or the MMRA tariff, should be dismissed. In a supplemental and amending petition filed on the second day of trial LP&L limited its claim to $27,664.64 on the basis of the LGS-5 tariff for the period December 9, 1967, to April 1, 1970.
In the meantime White-Hill, in a supplemental answer, injected two additional issues, to wit, that the LP&L charges included "demand" charges and "facilities" charges not authorized by law or by LPSC.
Generally, the same issues were included in the litigation against Crescent, but there LP&L raised an additional issue that in June, 1968, LPSC had issued an order promulgating the MMRA-1 tariff to be applicable "with respect to all new customers" and that when the apartment complex was sold to Crescent and it became the recipient of the electrical service it was a new customer within the meaning of that order.
The trial judge awarded LP&L the sum of $14,457.37 against White-Hill without interest but with court costs and in written reasons concluded as follows:
"(2) That the `demand factor charge' is authorized by the LGS-5 tariff which contemplates that this factor be measured by a meter; the defendants were aware that this demand factor was not being measured by a meter and that this charge was not being included in their monthly remittances to the utility and the defendants had agreed to pay this charge when calculated. The Court concludes that the plaintiff's computation of *362 this charge is reasonable, and that this charge was contemplated and agreed to by the litigants when the services were furnished.
"(3) that the effective date that the defendants were entitled to receive electric service at the LGS-5 tariff rate is fixed by the Louisiana Public Service Commission and this Court has no authority to change the effective date of the tariff found applicable by the Commission, and no authority to determine which tariff was applicable at an earlier period; therefore the defendants cannot be given a credit for their payments for electric service during the period from March, 1967, to December, 1967.
"(4) that the `facilities charge' in the amount of $13,207.27 is not authorized by the applicable LGS-5 tariff; nor was this charge included in any agreement between the litigants, and this amount will be deducted from plaintiff's claim.
"(5) that the plaintiff's computation of charges is based upon the applicable tariff, and this computation, together with the estimated demand charge, and less the proposed facilities charge, will be accepted as correct for the services furnished."
In the Crescent case, the trial judge dismissed LP&L's suit for the following reasons:
"To determine which of the above rates [MMRA-1 tariff or LGS-5 tariff] is applicable, it is necessary to determine whether the defendant is a `new customer' within the meaning of Louisiana Public Service Commission Order No. 10053, or to put it another way, in order to adjudicate this dispute the Court will have to decide which of the above two rates is applicable.
"However, the rate fixing power is vested exclusively in the Louisiana Public Service Commission. Louisiana Constitution of 1921, Article 6, Sections 3 and 4.
"`The rate fixing power of a Commission includes jurisdiction to determine which, if any, of several rates is applicable to a purchaser of electricity from a public utility, under the particular conditions and circumstances surrounding the use of the electricity by the purchaser.'
"C.J.S.ElectricitySection 30
"The Court concludes that it lacks jurisdiction to adjudicate this dispute until the rate schedule applicable to the electrical service furnished to defendant has been determined by the Louisiana Public Service Commission.
"The litigants cannot resort to the Courts until they have exhausted their available remedies before the Louisiana Public Service Commission."
White-Hill have appealed from the first judgment and LP&L has appealed from both judgments.
White-Hill specify error in the judgment of the trial court in the following particulars: (1) In holding that the LGS-5 tariff became applicable only after the date of the order of LPSC on December 9, 1967, rather than in March, 1967, when White-Hill made the request for the master meter with the corresponding commercial tariff; (2) in allowing LP&L to recover a demand charge even though demand was not measured by a meter as required by law but was subsequently estimated, and in finding that White-Hill had agreed to pay the demand charges despite the fact that they were not supported by a meter reading; and (3) in casting White-Hill for court costs while denying interest on the judgment, thereby sustaining White-Hill's plea of lack of amicable demand. LP&L species error in the judgments of the trial judge in the following particulars: (1) Failing to award the facilities charge; (2) denying interest on the amount of the judgment; and (3) dismissing its suit against Crescent for its failure to exhaust remedies before LPSC. A discussion and disposition of each of these specifications of error will follow. *363 IS THE EFFECTIVE DATE OF LPSC ORDER NO. 9981 DECEMBER 9, 1967, THE DATE OF THE ORDER OR MARCH 16, 1967, WHEN LP&L WAS REQUESTED TO APPLY THE LGS-5 TARIFF TO ELMWOOD?
Pursuant to LSA-Const. Art. 6 § 5, orders of LPSC "shall go into effect at such time as may be fixed by the Commission..." LSA-R.S. 45:1191 is to the same effect. Since the order in question specifies no other effective date, the date of its issuance must be considered such and we therefore find no error in the trial judge's disposition of this issue.
IS LP&L ENTITLED TO COLLECT "DEMAND" CHARGES?
The record shows that normal consumption of electricity is charged on the basis of kilowatt hours; that is, the total amount of electricity consumed over a period of time. For large consumers there is in addition to the charge for kilowatt hours of electricity a charge for the instantaneous demand placed on the system at one time measured by the highest surge of electricity demanded from the system during a 15-minute interval. Ordinary residential meters are not capable of measuring demand.
In order to arrive at its demand charges for the east half of Elmwood where there was no master meter LP&L made an estimate based upon the demand which was recorded in the west half of Elmwood by the master meter covering that section. To the estimated demand per apartment was added a factor to provide for electric water heaters located in the apartments in the east half since these were not installed in the west half. The total estimated figure for each disputed month was compared with the figures actually recorded on the master meter from March, 1972, until the date of the trial in March, 1973. This comparison showed that LP&L's estimate was quite conservative. The trial judge accepted the estimated figure and we find no error in that regard.
However, White-Hill contend that as a matter of law LP&L is not entitled to collect the demand charges because LSA-R.S. 45:845, 45:846 place the burden upon LP&L to provide a meter as a prerequisite for making any charge to its customers and that estimated bills may be rendered only with the approval of LPSC. But the issue is not so easily disposed of because of the relationship which existed between these parties during the time that the dispute over the applicable rate schedule was in progress before LPSC and the courts from April, 1967, until December, 1970, and thereafter because of the difficulties involved with implementing the judgment of the Supreme Court.
Upon the issuance of the order of LPSC in December, 1967, White-Hill advised LP&L that they were ready to comply with the order and make the necessary changes in order to convert to a master meter system at Elmwood. They were advised that LP&L had decided to appeal the order. That appeal culminated with the Supreme Court decision in Louisiana Power & Light Company v. Louisiana Public Service Commission, supra, which shows that LP&L had raised the issue that the order of LPSC required it to abandon a portion of its own distribution system then located inside Elmwood and constituted a taking of its property. The Supreme Court disposed of this contention as follows:
"As we view it, the Order decrees no expropriation. No transfer of property ownership takes place under the Order. It is true the Order requires changes, conversion of the meters and abandonment of segments of the internal distribution system. The record, however, reflects that Elmwood stands ready and willing to reimburse the utility for its loss of initial installation costs and reasonable expenses in complying with the Commission Order."
Until that decision became final, LP&L was availing itself of its right to the appellate process. It had on Elmwood's property *364 poles, lines, transformers and underground cables, serving 142 individual meters. It became necessary for White-Hill to buy from LP&L the facilities which they would then operate on their side of the master meter to be installed. Until the installation of the master meter or until the system was tied in with the master meter serving the west half of Elmwood there could be no measuring of demand at Elmwood. The record shows that while the appeal was pending the parties continued to negotiate a possible settlement of their differences, but the principal obstacle was the LP&L's mistaken notion that it could utilize some rate schedule other than the LGS-5 tariff. To say that LP&L should have acquiesced in the order of LPSC during the appellate process would be tantamount to saying that its appeal was frivolous and, clearly, this was not the case.
When the Supreme Court judgment became final, counsel for White-Hill advised LP&L through its counsel that LPSC was being requested to cite LP&L for contempt growing out of its failure to comply with the order of LPSC. In that letter, the following was said:
"All during this controversy, as you well know, Mr. White has always admitted that he is willing to pay LP&L the correct amount due it under the tariff published by the Commission. We readily recognize that in past remittances to the company we have not included amounts sufficient to cover the factor of `demand' for which LP&L is clearly entitled to payment. The reason for this non-payment, however, is solely because of our inability to compute this factor. We have always requested LP&L to compute and calculate the correct billing which it is entitled to based upon a commercial rate and upon the consumption of electricity in the entire apartment complex...."
In answer to that letter, LP&L forwarded a detailed statement with charges based on the LGS-5 for the period commencing December 9, 1967, and containing the estimated demand and facilities charges. This letter was met with the initiation of contempt proceedings against LP&L in Baton Rouge, while the present litigation continued. In a November, 1971, letter from counsel for White-Hill reference was specifically made to the correspondence referred to above and he then reiterated White-Hill's objection to the failure of LP&L to recognize as the effective date of the LPSC order April 16, 1967, rather than December and the propriety of the facilities charge. The letter contains the following:
"Of course, we all understand, that it will be necessary to calculate or estimate the demand for the east side apartments in some manner, because no meter was installed during the period of service which measured the demand. R.S. 45:845 requires the installation of meters and in such a manner that can be read by the customer, and R.S. 45:846 provides that there shall be no charge for electric service in excess of the meter reading. Of course, the apartment owners want to be fair about this and they are willing to pay for the demand charge which LP&L is entitled to if it can be recalculated with reasonable certainty."
While on the witness stand, defendant Perrin W. White in no way repudiated this correspondence but wanted simply to dismiss it as follows:
"The obligation that we have to pay a demand charge has been cancelled because of the fact that after the refusal to provide us with this informationit was never done and I don't think it would be at all fair to ask us to pay on the basis of an estimate we have no confidence in."
The "information" referred to by Mr. White was a calculation which would be satisfactory to him, something which LP&L could never provide, but it is clear that Perrin White never disputed LP&L's *365 right to collect the demand charges on the basis of an estimate for the period of time in question.
The statutes clearly entitle a consumer to insist upon a meter as the basis for the utility company's right to demand payment of its bill for services but nothing in the statute precludes parties from agreeing to payment of charges based on a future estimate. By the time Mr. White decided that he would not accept an estimate he had already by his own words and actions led LP&L to believe that an estimate would be satisfactory, so that White-Hill are now estopped from claiming that a meter was a prerequisite for collecting the demand charges.
IS LP&L ENTITLED TO COLLECT THE FACILITIES CHARGES?
White-Hill have contended from the outset that LP&L has no authority to collect these facilities charges relying on the fact that no tariff or regulation of LPSC furnishes the legal basis for such a charge. From the testimony of the witnesses it was established that where a utility company provides facilities on the customer's side of the meter the customer pays a facilities charge based upon 20% of the cost of the facilities per year. It is equally clear that in such instances this facilities charge is voluntarily by contract agreed to between the customer and the utility prior to the service being initiated. LPSC is granted plenary power with respect to the fixing of all charges by public utilities. LSA-Const. Art. 6 § 4. The record supports the trial judge's findings that no action by LPSC specifically authorized the facilities charges and that no agreement was made between the parties for the payment of such.
However, the facts of this case are so unique that no tariff could be expected to cover the situation. A utility company does not install its own facilities on the customer's side of the meter and enable the customer to have electrical service unless some arrangements are made in advance for the utility to be compensated for these facilities. In the instant case, when White-Hill constructed Elmwood, they voluntarily and on their own initiative opted to install individual meters in their 142 units. According to the testimony of Mr. White this was a considered judgment on their part at the time and in making that decision they decided to have LP&L provide all of the necessary equipment between the feeder lines around the circumference of the complex on public property and the individual meters located in banks on their own property. This equipment included overhead transmission lines, transformers and underground cables and lines. According to Mr. White they later decided that they had made a mistake and that they should have a master meter. Had they done so in the first place, they would have paid for the installation of all of the equipment between that master meter which would have been located just inside the circumference of their property and the individual apartments. When LP&L was eventually declared the loser in the litigation over the LPSC order to convert to a master meter, it was forced to give up some of its own facilities and a sale was eventually negotiated with White-Hill when the master meter was installed. Throughout the period of time of the contested billings in this case, White-Hill used LP&L's facilities against its wishes and without its consent. Furthermore, LP&L would not have been in this position in the first instance had it not been for the action of White-Hill in electing to have individual meters when they constructed Elmwood. To deprive LP&L of some fair rental for the use of its facilities during the period of time covering the disputed charges would offend basic principles of equity and fair play.
It should be noted here that only a portion of the facilities forming the basis of LP&L's charges was located on the White-Hill's side of the master meter *366 eventually installed. The remaining major portion of those facilities consisted of feeder lines around the perimeter of the property and "metering costs." White-Hill attempted to show that these feeder lines were capable of serving additional customers when and if the area in the vicinity of Elmwood would develop, but at the time of the development of Elmwood White-Hill was the only customer and its needs were the only basis for LP&L installing such feeder lines. Here again, had the relationship between these parties been normal in the first instance and had White-Hill originally elected to have a master meter and to utilize some electrical rate lower than the residential rate, LP&L would have been in a position to provide for the costs it would incur in bringing electrical service to the premises under those conditions, but instead LP&L was lured into the situation where it was serving 142 residential customers on individual meters at the top residential rate and was subsequently forced to accept a lower commercial rate for the reason that White-Hill decided that it had made a mistake in its judgment to have individual meters in the first instance. Under these circumstances, it would be clearly inequitable to penalize LP&L by depriving it of fair charges for its facilities.
Nothing in the constitution or the rules and regulations of LPSC have been cited to us which would govern this situation, and consequently we are constrained to call on equitable principles to resolve the controversy. The evidence is clear that the charge for the facilities was reasonable and fair under the circumstances.
DOES THE COURT HAVE JURISDICTION OVER THE DISPUTE BETWEEN LP&L AND CRESCENT OR MUST LP&L APPLY TO LPSC FOR RELIEF IN THIS DISPUTE?
Both LP&L and Crescent have taken issue with the trial judge's disposition of this aspect of the controversy. They both insist that the trial court had jurisdiction, LP&L contending that there should be a judgment based upon the MMRA-1 tariff, and Crescent insisting that LGS-5 tariff is applicable. Crescent also adopts the argument made by White-Hill and disposed of above, with respect to the facilities and demand charges.
In arriving at his decision, the trial judge relied upon Shreveport Laundries, Inc. v. Southern Cities Distributing Co., 176 La. 994, 147 So. 56, in which the court declined jurisdiction over a dispute between the plaintiff, operator of five steam laundries, claiming to be entitled to a gas rate based upon plaintiff's total consumption rather than a rate based upon separate bills rendered to each one of plaintiff's plants. The question of whether the words "each customer" in the rate authorized by the Commission was "a question of interpretation which, we think, should be answered primarily by the Public Service Commission. It is the jurisprudence of this state that, until the plaintiff has exhausted his available remedies before the commission, he cannot resort to the courts."
In Morrison's Cafeteria of Louisiana v. Public Service Commission, 181 La. 932, 160 So. 634, a claim for a refund of overcharges for electric service was brought by a consumer before the Louisiana Public Service Commission and the electric company challenged the jurisdiction of the Commission, contending that the court and not the Commission would have jurisdiction to render a money judgment in favor of the plaintiff. The Court held that the power to render a money judgment is a judicial and not an administrative function and that the Commission did not have jurisdiction over the dispute. The Court distinguished the Shreveport Laundries case on the basis that there the problem was a question of interpretation of a rate authorized by the Commission and not a matter of implementing the clear terms of a rate by awarding a money judgment to a consumer for an overcharge.
Similarly, we hold that where there is no ambiguity and where the court is *367 confronted with a rate tariff whose terms are clear and unambiguous the court is the proper forum in which to implement the charges authorized by that tariff. To hold otherwise would lead to an absurd condition where if the electric company filed suit against its customer for past due charges and the customer raised a defense, no matter how frivolous, that some other rate schedule approved and adopted by the regulatory body was applicable, the argument could be made that the court has no jurisdiction over the dispute but that the matter would have to be brought before the regulatory body for a resolution of the controversy.
On June 21, 1968, LPSC issued its Order No. 10053 to the effect that MMRA-1 would be applied "with respect to all new customers until June 30, 1969, at which time this Commission reserves the right to review, revoke or sustain same." This order followed findings of fact by LPSC that electric service is generally provided for residential, commercial and industrial consumption with rates graduated according to the cost to serve consumer loads and types of service required. Noting that the residential rate historically had been applied to apartments, there was now "a need for a specific rate to be applied to larger residential complexes."
The evidence shows that it is not unusual for a new rate to be authorized by LPSC for new customers while an existing rate will be frozen with respect to customers who were being served prior to the adoption of the new rate. Crescent contends that it is not a new customer because Elmwood is the customer regardless of who might be the legal owner thereof.
This argument has no merit. When Elmwood was sold by White-Hill to Crescent, as far as LP&L was concerned Crescent was a new customer. It signed an application for electrical service, posted a deposit and was treated by LP&L in the same way as if a customer applied for electrical service in a new building. The evidence shows that there is no relationship whatsoever between White-Hill and Crescent and that the sale was not simply a change in the legal status of White-Hill. Certainly if one sells his house to another the former owner terminates his relationship with the utility company and the new owner becomes the new customer of the utility. Similarly, Crescent was a new customer of LP&L and must be treated as such within the meaning of Order No. 10053.
Crescent contends that the order expired on June 30, 1969, on its own terms because LPSC took no action thereafter to "sustain same." But LSA-Const. Art. 6 § 5 provides otherwise:
"The orders of the Commission..... shall remain in effect and be complied with, unless and until set aside by the Commission....."
Thus, since LPSC has taken no action to set aside the order, it remains effective. See also LSA-R.S. 45:1191 to the same effect. This condition was verified by LPSC's chief engineer, called as a witness by Crescent, who testified that LPSC had taken no action with respect to Order No. 10053 and that the MMRA tariff was in LPSC's current rate schedule.
Crescent contends that this is a matter of res judicata because of the decision of the 19th Judicial District Court on October 24, 1971, in which LP&L and its president were found to be in contempt of court for their failure to comply with LPSC's Order No. 9981. Among the arguments made by LP&L in the contempt proceedings was that Order No. 10053 superseded Order No. 9981. But Crescent was not a party to those proceedings which were between White-Hill and LP&L and the trial judge there correctly held that Order No. 10053 had no application to White-Hill since it was not a "new customer." This judgment can hardly be said to be res judicata with respect to the dispute now existing between LP&L and Crescent, a "new customer."
*368 We have therefore concluded that MMRA-1 is the tariff applicable to Crescent and for the reasons already stated Crescent is liable under that tariff for the demand as well as the facilities charges.
IS LP&L ENTITLED TO INTEREST ON THE JUDGMENTS?
LSA-C.C. Art. 1938, before its amendment by Act 315 of 1970, provided as follows:
"All debts shall bear interest at the rate of five per centum per annum from the time they become due, unless otherwise stipulated."
The LGS-5 Tariff contains the following:
"PAYMENT
The Net Monthly Bill is due and payable each month upon presentation. If not paid within ten days from date thereof the Gross Monthly Bill, which is the Net Monthly Bill plus 2%, applies."
To White-Hill's contention that LP&L cannot collect legal interest because it is otherwise stipulated by the quoted tariff LP&L answers that the quoted provision from the tariff "is a late payment charge and has nothing to do with interest." And it relies upon Coffelt v. Arkansas Power & Light Company, 248 Ark. 313, 451 S.W.2d 881. In State v. Council of the City of New Orleans and New Orleans Public Service, Inc., La.App., 297 So.2d 518, 1974, it was held that the penalty for late payment of utility bills was equivalent to interest on the balance and the Court specifically declined to follow the rationale of the Coffelt case. Since that 2% penalty is included in LP&L's claim, since the penalty has been held to be interest by this Court, and since the imposition upon a debtor of legal interest pursuant to Art. 1938 is only imposed in the absence of a stipulation to the contrary, it follows that the trial judge correctly denied LP&L interest on the judgment.
IS LP&L ENTITLED TO COURT COSTS?
White-Hill contend that since the trial court awarded no interest to LP&L it follows that LP&L should have been cast for court costs. They refer to LSA-C.C.P. Art. 933, which provides as follows:
"If the dilatory exception pleading want of amicable demand is sustained, the final judgment shall impose all court costs upon the plaintiff."
They construe the trial judge's action in awarding no interest as tantamount to a maintenance of their exception of want of amicable demand, but the record shows that their plea of want of amicable demand was made after a preliminary default was taken against them by LP&L. Under LSA-C.C.P. Art. 928, dilatory exceptions must be filed prior to judgment by default and consequently this exception could not have been considered by the trial judge in the first instance. The casting of White-Hill for court costs has no connection whatsoever with the problem of whether LP&L is entitled to interest. LSA-C.C.P. Art. 1920 vests in the trial judge discretion to determine which party is cast for costs and his action in that regard will not be disturbed.
DECREE
For the foregoing reasons, the judgment in favor of Louisiana Power & Light Company and against Perrin W. White and James M. Hill, Jr. will be affirmed, but will be amended so as to include the facilities charges and the judgment in favor of Crescent Properties Co., Inc., dismissing the claim of Louisiana Power & Light Company will be reversed so as to award the latter a judgment based upon the MMRA-1 tariff and including the demand and facilities charges but without any interest.
Accordingly, it is ordered, adjudged and decreed that there be judgment in favor of Louisiana Power & Light Company and *369 against Perrin W. White and James M. Hill, Jr., jointly and in solido in the sum of $27,664.64 without interest but with all costs of these proceedings.
It is further ordered, adjudged and decreed that there be judgment in favor of Louisiana Power & Light Company and against Crescent Properties, Inc. in the sum of $18,987.23 without interest but with all costs of these proceedings.
Reversed in part, amended in part, and affirmed in part.

ORDER ON APPLICATIONS FOR REHEARING
The Court considering the applications for rehearing filed herein by Louisiana Power & Light Company, Plaintiff-Appellant, Perrin W. White and James M. Hill, Jr., Defendants-Appellants, and Crescent Properties Co., Inc., Defendant-Appellee;
It is ordered that the application for rehearing filed in these consolidated cases by Louisiana Power & Light Company be, and the same is hereby granted;
It is further ordered that the application for rehearing filed by Perrin W. White and James M. Hill, Jr., in proceedings No. 6261 be and the same is hereby denied;
It is further ordered that the application for rehearing filed by Crescent Properties Co., Inc. in proceedings No. 6262 be and the same is hereby granted with the understanding that the Court will consider only those arguments addressed to the issue of payment by Crescent Properties Co., Inc. of the estimated demand charge and the facilities charge.
It is further ordered that oral arguments on rehearing are scheduled for 10:00 AM on September 30, 1974, and that if the parties desire to submit additional briefs they may do so not later than September 25, 1974.

ON APPLICATION FOR REHEARING
SCHOTT, Judge.
We granted applications for rehearing filed by LP&L and Crescent, and have reconsidered the questions of whether LP&L is entitled to interest on the judgments and whether LP&L is entitled to collect the demand and facilities charges from Crescent.
On the question of interest, the statement in our original opinion to the effect that the "2% penalty is included in LP&L's claim" is erroneous. The record shows that LP&L did not include the 2% penalty in its original claim and did not ask for this penalty in its original brief to this Court. It sought only legal interest on the amount of its claim. In its application for rehearing LP&L states that its failure to include the 2% penalty "is consistent with a longstanding policy of LP&L's not to include the 2% charge when the bill is in litigious dispute."
In any event, the 2% penalty is authorized by the tariffs and the question is whether LSA-C.C. Art. 1938 is applicable. It provides for legal interest on all debts "unless otherwise stipulated."
State ex rel. Guste v. Council of City of New Orleans, 297 So.2d 518 (La.App. 4th Cir. 1974) has no application to the instant case. There the Court concluded that the late payment penalty charged by New Orleans Public Service, Inc. to its customers was interest on the basis of evidence as to the amount of the penalty, the time limit set for payment without penalty, the administrative procedure and policies employed by that company in the allocation and treatment of revenues derived from penalty payments and other factors.
These issues were neither presented nor developed at the trial of the instant case so that there is no evidentiary basis for deciding whether LP&L's penalty is interest or not. LSA-C.C. Art. 1935 provides that "The damages due for delay in the performance *370 of an obligation to pay money are called interest." But the 2% penalty here is uniformly included in the tariffs as a part of the rates charged. We cannot assume absent a showing that the penalty does not bear some relationship to the rate structure adopted by LP&L and approved by LPSC other than mere "damages due for delay." Thus, since we do not find that the 2% penalty is interest, we do not find that interest is "otherwise stipulated" and LP&L is entitled to legal interest on the judgments.
Crescent's position with respect to the demand and facilities charges is that even if principles of equitable estoppel arising out of certain acts and words of White-Hill may provide a basis for their liability for such charges, such acts and words of White-Hill cannot be imputed to Crescent. On reconsideration we have concluded that Crescent's position is correct with respect to the facilities charges, but we adhere to our original views as to the demand charges.
As to the latter, we hold that while the law entitles a consumer to insist upon a meter as the basis for the utility company's right to demand payment of its bill for services, there is nothing in the law which precludes parties from agreeing to payment based upon a future estimate. The correspondence between counsel for White-Hill and LP&L, alluded to in our original opinion, came in September, 1970, and November, 1971, long after Elmwood was sold by White-Hill to Crescent. Crescent continued to be represented by the same counsel. No distinction whatsoever was made in that correspondence as to Crescent's position, and it was reasonable for LP&L to conclude that the attorney's statements, such as "we readily recognize that in past remittances to the company we have not included amounts sufficient to cover the factor of `demand' for which LP&L is clearly entitled to payment," and, "Of course we all understand that it will be necessary to calculate or estimate the demand for the east side apartments in some manner, because no meter was installed during the period of service which measured the demand ... of course the apartment owners want to be fair about this and they are willing to pay for the demand charge which LP&L is entitled to if it can be recalculated with reasonable certainty," were being made in behalf of Crescent as well as White-Hill. It was reasonable for LP&L to conclude that both owners were waiving the requirement of a meter to measure demand while the dispute was pending.
The problem of the facilities charge is quite different. As we held in our original opinion, a utility company does not normally install its own facilities on the customer's side of the meter and provide electrical service unless arrangements are made in advance for the utility to be compensated for these facilities. But under the unusual circumstances existing in this case, where White-Hill had originally decided to have individual meters in the 142 apartments, and subsequently decided that this was a mistake and that they should have a master meter, LP&L was ultimately left in the situation where its facilities were now already installed on the basis of the commercial tariff and the master meter without the benefit of any prearranged rental for such facilities. Since LP&L was placed in this position by White-Hill's decision to have individual meters in the first instance we resolved this problem on the basis of equitable principles which seemed to militate in favor of LP&L as opposed to White-Hill.
On the other hand, these principles do not apply to Crescent. At the time it purchased the apartments the controversy between White-Hill and LP&L had been in progress for some time and Crescent had no part of the original decision to have individual meters as opposed to a master meter. We have held that Crescent was a new customer and was therefore entitled to be charged on the basis of the MMRA-1 tariff. We arrived at this conclusion on *371 the basis of evidence which showed that Crescent was treated by LP&L as a new customer when it purchased Elmwood, that Crescent signed new applications for electrical service, that it posted deposits and was treated by LP&L in the same way as any other new customer. Of course Crescent never agreed to pay the facilities charge and unlike White-Hill it performed no acts which provide any basis whatsoever for its being compelled to do so. The records shows that the facilities charge made against Crescent is $6,371.71 so that this amount is to be deducted from the amount of the judgment against it in favor of LP&L.
Accordingly, our original decree is reinstated but amended so that the trial court's judgment in favor of Louisiana Power & Light Company and against Perrin W. White and James M. Hill, Jr. will be affirmed but amended so as to include the facilities charges, and further amended so as to include legal interest. The trial court's judgment in favor of Crescent Properties Co., Inc., dismissing the claim of Louisiana Power & Light Company, is reversed so as to award a judgment in favor of Louisiana Power & Light Company based upon the MMRA-1 tariff, and including the demand but excluding the facilities charges, and with legal interest on such amount.
Accordingly, it is now ordered, adjudged and decreed that there be judgment in favor of Louisiana Power & Light Company and against Perrin W. White and James M. Hill, Jr. jointly and in solido in the sum of $27,664.64, with legal interest from date of judicial demand until paid and for all costs of these proceedings.
It is further ordered, adjudged and decreed that there be judgment in favor of Louisiana Power & Light Company and against Crescent Properties, Inc. in the sum of $12,615.52, with legal interest from date of judicial demand until paid, and for all costs of these proceedings.
Original decree reinstated in part and amended in part.
LEMMON, J., dissents in part.

No. 6261
LEMMON, Judge (dissenting in part).
I disagree with that part of our judgment which awards interest.
The 2% penalty applies when the monthly bill is not paid within ten days of presentation. On its face the penalty is "damages due for delay." C.C. art. 1935. Since the record contains no other explanation, the late payment penalty must be considered interest.
Inasmuch as interest is "otherwise stipulated" (at least for the first ten days the debt is due), C.C. art. 1938's imposition of 5% per annum interest does not apply.
Louisiana Power & Light Company is therefore relegated to collection of the interest provided in the tariff, a 2% flat charge. However, a 2% charge for a tenday delay in payment is clearly usurious. C.C. art. 2924. R.S. 9:3501 mandates forfeiture of the entire interest.
In my opinion no interest should be awarded.

No. 6262
LEMMON, Judge (dissenting in part).
I dissent in part for reasons assigned in No. 6261.
NOTES
[1] According to the pleadings filed by White-Hill and Crescent, after the judgment of the Supreme Court in Louisiana Power & Light Company v. Louisiana Public Service Commission, supra, became final, LP&L served notice of intention to file application for writs to the United States Supreme Court. On November 24, 1970, this application was dismissed for nonprosecution.