612 So.2d 7 (1993)
The DAILY ADVERTISER, Richard D'Aquin, Mr. Cook Licensing Corporation d/b/a Mr. Cook Restaurants, Compagnie Vermilion Incorporated, Compagnie CL-BM, Ltd., and C. Earl Hagood, Jr., Individually and on Behalf of All Others Similarly Situated
v.
TRANS-LA (A DIVISION OF ATMOS ENERGY CORPORATION d/b/a Energas Company), Louisiana Intrastate Gas Corporation, Lig Chemical Company, Tuscaloosa Pipeline Company, and Trans-Louisiana Industrial Gas Company, Inc.
Nos. 92-C-0988, 92-C-1001.
Supreme Court of Louisiana.
January 19, 1993.
*10 Sheryl Lines Hopkins, New Orleans, Orrin L. Harrison, III, Vinson & Elkins, Don E. James, Dallas, Tex., Jon Kenton Parsons, Roedel, Parsons, Forrester & Koch, Baton Rouge, for applicant.
Oscar E. Reed, Jr., William Martin Hudson, III, Oats & Hudson, Bob F. Wright, James Parkerson Roy, Domengeaux & Wright, Lafayette, Eddie J. Jordan, Jr., Sessions & Fishman, Walter C. Thompson, Jr., Barkley & Thompson, Ernest L. Edwards, George Frazier, IV, C. David Vasser, Jr., Lemle & Kelleher, New Orleans, Lawrence E. Donohoe, Jr., Onebane, Donohoe, Bernard, Torian, Diaz, Abel & McNamara, Lafayette, Jeffrey Allan Riggs, Le-Doux R. Provosty, Jr., Provosty, Sadler & deLaunay, Alexandria, for respondent.
Constance Charles Willems, McGlinchey Stafford Lang, New Orleans, for Entex, a div. of Arkla, Inc., and Louisiana Gas Service Co., a div. of Citizens Utilities Co., amicus curiae.
Thomas O. Lind, J. Wayne Anderson, Margaret McAliste Silverstein, Monroe & Lemann, New Orleans, for Louisiana Power and Light Co., amicus curiae.
Robert Ryland Percy, III, Percy & Pujol, Gonzales, for East Ascension Telephone Co., amicus curiae.
*11 Carolyn L. DeVitis, Denham Springs, Michael R. Fontham, Paul Lewis Zimmering, Karen H. Freese, Stone, Pigman, Walther, Wittmann & Hutchinson, New Orleans, Rickey Wayne Miniex, Simien & Miniex, Lafayette, for Louisiana Public Service Com', amicus curiae.
John B. Hussey, Jr., Wilkinson, Carmody, Gilliam & Hussey, Shreveport, for Southwestern Elec. Power Co., amicus curiae.
Ashton R. Hardy, Regina Carol Scotto Wedig, Marjorie Ruth Esman, New Orleans, for Radiofone, Inc., amicus curiae.
Edward Hart Bergin, M. Megan Shemwell, T. Michael Twomey, Leslie Barbee Ponder IV, Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, for BellSouth Telecommunications, Inc. d/b/a South Central Bell Telephone Co., amicus curiae.
Richard P. Ieyoub, Atty. Gen., James Marshall Ross, Baton Rouge, for State of La., amicus curiae.
James Leeper Ellis, Baton Rouge, for Gulf States Utilities Co., amicus curiae.
William O. Bonin, New Iberia, for Central Louisiana Elec. Co., amicus curiae.
HALL, Justice.[*]
We granted certiorari to decide whether the district court or the Louisiana Public Service Commission ("LPSC") has subject matter jurisdiction to adjudicate a claim by a class of residential and commercial end users of natural gas against several intrastate natural gas pipeline companies and distributors, arising out of the alleged manipulation of automatic fuel adjustment clauses.[1] To resolve this issue, we must determine whether this is an antitrust or a damage action properly commenced in the district court, as the lower courts held, or a rate case within the LPSC's exclusive jurisdiction, as defendants strongly urge. We find that this is primarily a rate case that must be decided, in the first instance, by the LPSC and thus reverse in part.

I.
The plaintiffs are residential and commercial natural gas customers of Trans-La, a Division of Atmos Energy Corporation d/b/a Energas Company ("Trans-La"). Plaintiffs have styled their claim as a class action brought on behalf of themselves individually and on behalf of all others similarly situated. The individual plaintiffs are The Daily Advertiser;[2] Richard D'Aquin; Mr. Cook Licensing Corporation d/b/a Mr. Cook Restaurants; Compagnie Vermilion Incorporated; Compagnie CL-BM, Ltd.; and C. Earl Hagood, Jr. The total number of class members is alleged to exceed 60,000 present and prior customers, and the class members are alleged to be geographically dispersed throughout Trans-La's service area, which encompasses several parishes.
*12 Plaintiffs have named as defendants five entities, two of which are LPSC-regulated and three of which are unregulated. The regulated entities are Trans-La and Louisiana Intrastate Gas Corporation ("LIG"). Trans-La is a local distribution company in the business of supplying natural gas in several Louisiana parishes to residential and commercial customers, including plaintiffs. LIG is a Louisiana intrastate pipeline in the business of receiving gas from different areas and transporting it to, among others, local distribution companies, including Trans-La.
Pursuant to an alleged 1983 contract between LIG and Trans-La (the "1983 Contract"), Trans-La acquired virtually all of its gas during the relevant period from LIG. Because of the procedural posture of this case (pre-trial motions stage), the 1983 Contract has not yet been admitted into evidence, and it is unclear whether any of the other defendants were signatories to this contract. Nonetheless, plaintiffs allege that the 1983 Contract has a 10-year term and obligates Trans-La to obtain all of its intrastate natural gas requirements from LIG unless LIG waives this "all requirements" provision. Plaintiffs further allege that the price under this contract is set by reference to LIG's tariff on file with the LPSC.
The three unregulated defendants are affiliates of the two regulated defendants. Namely, the three unregulated defendants are LIG Chemical Company ("Lig Chem"), Tuscaloosa Pipeline Company ("Tuscaloosa"), and Trans-Louisiana Industrial Gas Company, Inc. ("T-Lig"). T-Lig is a subsidiary of Trans-La; Lig Chem and Tuscaloosa are subsidiaries of LIG.[3] The affiliates are in the business of transporting, selling, and/or brokering intrastate natural gas in the unregulated industrial market.[4]
Another relevant player in this case is the LPSC. As noted above, the LPSC regulates both LIG and Trans-La. In so doing, it sets the rates at which LIG sells its gas to Trans-La, and the rates at which Trans-La, in turn, resells such gas to its customers. The LPSC, spurred by plaintiffs' claims, has instigated an investigation into the rates charged by Trans-La and LIG.
The rate that the LPSC mandates LIG charge its customers, including Trans-La, is comprised of two components: LIG's weighted average cost of gas ("WACOG") plus $0.13 per mcf.[5] The LPSC has issued orders authorizing intrastate pipelines, like LIG, to pass onto their customers any fluctuations in their WACOG on a monthly basis; hence, the WACOG functions as an automatic fuel adjustment clause.[6] The LPSC has also issued orders requiring intrastate pipelines to inform their customers of any such changes in their WACOG each month. Pursuant to the LPSC's orders and its tariff, LIG files its WACOG computations monthly with the LPSC. These computations specify the gas purchases and costs by producer, contract, volume, and amount paid. These filings go into effect when approved by the LPSC. The LPSC has approved each of LIG's filings since the early to mid-1970's.
The rate that the LPSC mandates local distribution companies, like Trans-La, charge their customers likewise has two components: their actual cost of gas and an approved amount for return on equity.[7] *13 As mentioned above, Trans-La purchased virtually all of its gas during the relevant period from LIG under the 1983 Contract. Thus, Trans-La's actual cost of gas purchased during this time frame was equal to LIG's WACOG plus $0.13 per mcf, and LIG's WACOG is the only variable rate component at issue. The mechanism via which Trans-La passes on its increases or decreases in gas costs to its customers is its purchase gas adjustment ("PGA") clause.[8] Similar to LIG, Trans-La files its PGA computations monthly with the LPSC, setting out the cost of gas that it pays to LIG and passes through to its customers. The LPSC has approved each of Trans-La's PGA filings.[9]

II.
In March 1991, plaintiffs commenced the instant class action seeking monetary, injunctive, and declaratory relief against defendants in the Fifteen Judicial District Court for the Parish of Lafayette.[10] Plaintiffs allege in their petition five state law causes of action: antitrust violations, breach of contract pour autrui, breach of fiduciary duty, unjust enrichment, and fraud. These claims are all based on the same operative facts, which plaintiffs' lengthy petition portrays as follows.
Beginning around 1981 or 1982, LIG allegedly implemented a "marketing plan" in order to enhance its profits. This plan included, among other things, the diversion of many of its less expensive intrastate natural gas purchase contracts (so called "cheap gas") to the unregulated defendantsLIG Chem, Tuscaloosa and T-LIG (the "Affiliate Corporations")leaving the more expensive gas for resale to its regulated customers, such as Trans-La. This diversion of cheap gas had a two-fold effect. First, it enabled the Affiliate Corporations to engage in price competition in the unregulated intrastate industrial gas market. Second, it caused a concomitant increase in LIG's WACOG, as the cheap gas thereby was excluded from LIG's WACOG computations.
Plaintiffs allege that defendants further manipulated the WACOG computations by conspiring to include improper costs, and to exclude proper credits, within the rate structure and the WACOG component of the rate structure, resulting in an artificial increase in LIG's WACOG and, in turn, excessive rates being passed onto them via Trans-La's PGA clause. Particularly, plaintiffs identify four items that allegedly were improperly included in LIG's WACOG calculations: (1) take-or-pay costs, (2) third-party transportation costs, (3) commissions paid in connection with the acquisition of intrastate natural gas supplies, and (4) charges associated with the processing of natural gas. Plaintiffs allege that defendants successfully concealed such manipulations by making false or misleading written submissions to the LPSC; omitting material facts from written submissions to the LPSC; and providing untruthful, misleading, or incomplete information to the LPSC.
To summarize, plaintiffs claim that they were overcharged as a result of defendants' manipulation of these WACOG and PGA automatic fuel adjustment clauses. LIG's WACOG calculations allegedly were artificially inflated in two ways: (1) diverting cheap gas to the Affiliate Corporations, and (2) including improper costs and excluding proper credits. Trans-La, in turn, allegedly passed on these inflated costs through its PGA clause to its residential and commercial customers, who plaintiffs *14 represent. The effect of defendants' manipulation of these automatic fuel adjustment clauses, coupled with the execution and implementation of the 1983 Contract, plaintiffs contend, was to confer on defendants an illegal monopoly over the pricing and supply of intrastate natural gas within the relevant market. In redress for these alleged violations, plaintiffs seek consequential damages, treble damages under the Louisiana antitrust violation provision (LSA-R.S. 51:137), and declaratory and injunctive relief from the 1983 Contract.
Defendants responded to these claims by filing exceptions,[11] including the declinatory exception of lack of subject matter jurisdiction that is the crux of the instant dispute.[12] Defendants strongly urge that only the LPSC can hear this case because the redress plaintiffs seek affects gas rates, a matter vested solely within the LPSC's jurisdiction. Stated another way, defendants contend that the essence of plaintiffs' claims is that the rates Trans-La paid LIG, and the rates plaintiffs, in turn, paid Trans-La, have been excessive since 1983. Alternatively, defendants contend that plaintiffs' claims constitute an appeal of, or seek a modification or alteration in, LPSC rate orders and that venue for such an action is proper only in the parish of the LPSC's domicile, that is, the Nineteenth Judicial District Court for the Parish of East Baton Rouge. La. Const. Art. IV, § 21(E); LSA-R.S. 45:1192. Plaintiffs, on the other hand, insist that their petition alleges state law antitrust violations as well as other state law causes of action, which are all matters resting solely within the district court's jurisdiction. Plaintiffs emphasize that what they seek is monetary damages, including treble damages under the Louisiana antitrust laws, and that the LPSC lacks the authority to render such damage awards.
Agreeing with plaintiffs, the district court overruled defendants' exception of lack of subject matter jurisdiction. In so doing, the district court rejected defendants attempt to classify this as a "rate case" or a collateral attack on a LPSC order, reasoning:
"This Court finds that if this was a `rate case' as the defendants contend, then the [L]PSC would have exclusive jurisdiction. However, this is not a `rate case' and this Court has jurisdiction to hear it. This Court also finds that this action does not involve an appeal of the [L]PSC's orders or a challenge to [L]PSC rates or regulations.... This Court finds that plaintiff's petition alleges ... antitrust and other state law claims and the [L]PSC lacks jurisdiction over them. This Court will not allow the [L]PSC to usurp it's [sic] authority."
In support of this finding, the district court cited City of New Orleans v. United Gas Pipe Line Co., 438 So.2d 264 (La.App. 4th Cir.), writ denied, 442 So.2d 463 (La. 1983), for the proposition that the determination of damages is solely a judicial function. The court also cited South-West Utilities, Inc. v. South Central Bell Telephone Co., 339 So.2d 425 (La.App. 1st Cir. 1976), for the proposition that LPSC regulation does not preempt the Louisiana antitrust laws. Thus, the district court denied defendants' exception of lack of subject matter jurisdiction.
While the usual procedural vehicle for seeking review of such an interlocutory judgment (pre-trial denial of exceptions) would have been supervisory writs, defendants were afforded an expedited right of appeal pursuant to LSA-R.S. 51:134, a special *15 provision for antitrust actions.[13] Because of this unusual procedure, the court of appeal, over defendants' protestations, found that plaintiffs' claims for breach of contract pour autrui, breach of fiduciary duty, unjust enrichment, and fraud were not before it on appeal, and limited its analysis to plaintiffs' antitrust claim. Daily Advertiser v. Trans-La, 594 So.2d 546, 547 n. 2 (La.App. 3d Cir.), writs granted, 608 So.2d 1009 (La.1992).[14]
Addressing plaintiffs' antitrust claims, the court of appeal framed the issue as whether the LPSC's jurisdiction preempts the Louisiana antitrust laws under these circumstances. The court answered this question in the negative, opining:
We recognize that the [L]PSC has been statutorily granted broad powers in discharging its duty in regulating rates. However, as exhibited in South-West Utilities v. S. Cent. Bell Tel., 339 So.2d 425 (La.App. 1st Cir.1976), the broad powers of the [L]PSC do not preempt Louisiana antitrust laws although rates may be affected. To the contrary, Louisiana, as well as courts of other jurisdictions, jealously guard its forums to determine antitrust violations....
As we perceive plaintiffs' allegations, this is not a rate case. We are mindful that at this preliminary stage of the proceedings, there is no evidence of record to support their allegations because this issue came up on an exception prior to trial on the merits; therefore, we are only examining allegations. However, we are satisfied that their allegations sufficiently raise antitrust violations in restraint of trade and/or price fixing. The proper forum to determine antitrust allegations is a Louisiana court. South-West Utilities, supra. As stated in South-West Utilities, if it should later develop that this is merely a rate case, then the learned trial court can defer this entire matter to the [L]PSC for a proper rate determination.
Daily Advertiser, 594 So.2d at 550-51. Thus, the court held that the district court was the proper forum to adjudicate plaintiffs' antitrust claim.
The court of appeal also rejected defendants' alternative argument that the primary jurisdiction doctrine should be applied. Relying again on South-West Utilities, supra, the court found "that since the issues before the court concern allegations of antitrust violations, the trial court possesses the expertise to examine Louisiana law on these issues and make its determination. Further, the [L]PSC lacks the jurisdiction to grant the relief the plaintiffs seek should they prove their case." 594 So.2d at 551. Thus, the court, while leaving the door open for later deferral, found no need at the preliminary state of this proceeding to invoke the primary jurisdiction doctrine.
We granted defendants' writ applications to consider this significant jurisdictional issue. 608 So.2d 1009 (La.1992).

*16 III.
The issue before us is subject matter jurisdiction, which means the legal power and authority of a tribunal to adjudicate a particular matter involving the legal relations of the parties and to grant the relief to which the parties are entitled. LSA-C.C.P. Arts. 1 and 2. More precisely, the issue before us is original jurisdiction, which means jurisdiction in the first instance, that is, "the adjudicative tribunal in which the initial adjudication is made." Moore v. Roemer, 567 So.2d 75, 79 (La. 1990) (citing 20 Am.Jur.2d Courts § 98 (1965)). Original jurisdiction of the instant matter lies in either the district court in which the plaintiffs commenced it, or in the LPSC in which an investigation of it is currently pending, or in both. The adjudicative authority of both these tribunals stems from the Louisiana Constitution.
La. Const. Art. V, § 16(A) vests in the district courts "original jurisdiction of all civil and criminal matters," unless there is other jurisdictional authorization in the constitution. Central Louisiana Electric Co., Inc. v. Louisiana Public Service Comm'n, 601 So.2d 1383, 1386 (La.1992) (hereinafter "CLECO"). An antitrust or a damage action, as plaintiffs couch their claims, generally would constitute a civil matter over which the district court would have jurisdiction; "[d]amage suits of all kinds ... have long been the warp and woof of the caseload of the courts." Magnolia Coal Terminal v. Phillips Oil Co., 576 So.2d 475, 487 (La.1991) (Dennis, J. concurring). Yet, the manner in which plaintiffs couch their claims does not automatically vest jurisdiction in the district court; rather, the nature of the relief demanded is dispositive. CLECO, supra. Nor does the fact that a party to an action qualifies as a public utility automatically divest a court of original jurisdiction; however, that fact renders another constitutional provision arguably applicable.
The other relevant constitutional provision is La. Const. Art. IV, § 21(B), which vests jurisdiction over public utilities in general and rates in particular in the LPSC, providing:
The commission shall regulate all common carriers and public utilities and have such other regulatory authority as provided by law. It shall adopt and enforce reasonable rules, regulations, and procedures necessary for the discharge of its duties, and shall have other powers and perform other duties as provided by law.
Construing this provision, we have held that it "grants `in mandatory language, constitutional jurisdiction to the commission over all common carriers and public utilities.'" Louisiana Power & Light Co. v. Louisiana Public Service Comm'n, 609 So.2d 797, 1992 W.L. 355138 (La.1992) (No. 92-CA-1186) (quoting Cajun Electric Power Cooperative, Inc. v. Louisiana Public Service Comm'n, 544 So.2d 362 (La.1989), cert. denied, 493 U.S. 991, 110 S.Ct. 538, 107 L.Ed.2d 536 (1989)). We further have held that it provides the LPSC with "broad and independent" regulatory powers over public utilities. Id. Indeed, we have labelled the LPSC's jurisdiction over public utilities as "plenary." Gulf States Utilities Co. v. Louisiana Public Service Comm'n, 578 So.2d 71, 100 (La.1991), cert. denied, ___ U.S. ___, 112 S.Ct. 637, 116 L.Ed.2d 655 (1991).[15]
We also have construed this provision as conferring upon the LPSC exclusive jurisdiction, in the first instance, to fix or change any rate to be charged by a public utility; the courts lack the power to fix or change rates until the LPSC has acted. Gulf States, supra; Louisiana Power & Light Co. v. Louisiana Public Service Comm'n, 523 So.2d 850, 856 (La. 1988). "Although courts are statutorily permitted to `change, modify, alter, or ... set ... aside [orders of the Commission], as justice may require,' LSA-R.S. 45:1192, that statutory standard of review may not supercede or abrogate the constitutional *17 scheme in which plenary ratemaking authority is delegated to the Public Service Commission." Gulf States, 578 So.2d at 100 (emphasis supplied). The only jurisdiction courts have over the fixing of utility rates is to review the LPSC's orders on appeal. Louisiana Gas Service Co. v. Louisiana Public Service Comm'n, 245 La. 1029, 162 So.2d 555, 563 (1964). Even when exercising appellate jurisdiction over a rate order, a court may not, in the first instance, fix or change rates to be charged by a public utility, but rather must remand to the LPSC for it to determine the appropriate rate to be charged customers. Louisiana Power & Light, 523 So.2d at 856.
The LPSC is unique in that, unlike the commissions in most other states which are statutory creatures subject to the authority of the respective state legislatures, the LPSC is a constitutional creature. Knight, The Louisiana Public Service Commission, 16 Tul.L.Rev. 1, 3 (1941) ("Knight"). Because the LPSC is a constitutional creature, the legislature may not curtail its powers. Cajun Electric, supra; Knight, supra. Pursuant to La. Const. Art. IV, § 21(B), however, the legislature may bestow other regulatory powers on the LPSC; thus, other statutory material may be relevant in defining the LPSC's jurisdiction. CLECO, supra. Indeed, the court of appeal identified the other statutory material pertinent in resolving the jurisdictional issue before us:
The [L]PSC is ... statutorily mandated [by LSA-R.S. 45:303 and 1163] to regulate gas rates of residential and commercial end users.... Regulating rates includes "... for the purpose of fixing and regulating the rates charged or to be charged by and service furnished by such public utilities; ..." LSA-R.S. 45:1163. Under LSA-R.S. 45:1176, the [L]PSC has the authority to "... investigate the reasonableness and justness of all contracts, agreements and charges entered into or paid by such public utilities with or to other persons, whether affiliated with such public utilities or not, and shall have the power to disallow as an operating expense of any public utility such part of the amount so paid by it under any such contract or agreement as the commission... may find, after hearing, to be unjust or unreasonable and designed for the purpose of concealing, abstracting or dissipating the net earnings of the public utility." Under LSA-R.S. 45:303, the [L]PSC is "to remove the prejudicial effect" of pricing in the industrial market.
Daily Advertiser, 594 So.2d at 550. We identify another relevant provision: LSA-R.S. 45:302, which grants the LPSC sweeping authority over the regulation of natural gas pipe lines.[16] In short, the LPSC has constitutional and statutory jurisdiction over subject matters which principally involve the right to fix and regulate rates charged by public utilities to their customers. CLECO, 601 So.2d at 1386.
The jurisdictional issue before us brings into question the line of demarcation between the LPSC's authority to regulate rates and the district court's authority to apply and enforce Louisiana antitrust and other laws. Addressing a similar jurisdictional issue, we recently enunciated the following framework, set forth in CLECO, supra, for selecting between these fora:
[T]he [L]PSC has constitutional and statutory jurisdiction over subject matters which principally involve the right to fix and regulate rates charged by and service furnished by public utilities. The Legislature has never "provided by law" for the [L]PSC to exercise jurisdiction over other subject matters and areas of litigation in which public utilities are involved, *18 such as tort actions and contract disputes. It is therefore necessary at the outset to determine the relief demanded by all parties in order to resolve the subject matter jurisdiction issue.
601 So.2d at 1386. Consequently, in resolving this jurisdictional issue, we are not bound by the legal labels plaintiffs affix to their claims, or by defendants assertion of lack of jurisdiction. Rather, the jurisprudence requires that we look beneath these labels, ascertain the gravamen of plaintiffs' claims, and determine whether plaintiffs' claims are within the adjudicative sphere of the district court or the LPSC.
While there is a paucity of Louisiana jurisprudence directly pertaining to this jurisdictional issue,[17] a substantial body of case law and scholarly comment has evolvedprimarily at the federal level identifying three theories upon which courts have relied to defer to regulatory commissions: (1) the Keogh or filed-rate doctrine, (2) the exhaustion of administrative remedies rule (exclusive jurisdiction), and (3) the primary jurisdiction doctrine.

IV.
In support of the contention that the district court should defer to the LPSC, defendants, supported by various amici curiae, rely upon all three theories.[18] The Keogh or filed-rate doctrine,[19] defendants argue, applies when a regulated utility's customers attempt to bring a separate judicial action asserting that the filed rate is unreasonable or the product of a conspiracy in violation of the antitrust laws. Defendants argue that this is such a case. Defendants further argue that even assuming the filed-rate doctrine does not immunize the challenged conduct from antitrust claims, the exhaustion of administrative remedies rule requires dismissal because this is a rate case, involving consideration of an aspect of the LPSC-approved rate, over which the LPSC has exclusive jurisdiction. In support of this contention, defendants cite several paragraphs of plaintiffs' petition, which aver:
"The direct and proximate result of Defendants' conduct has been that Plaintiffs and the class have been forced to pay prices for natural gas that are unlawful and/or wrongful, and that were and are substantially and unconscionably higher than would prevail had Defendants not engaged in the unlawful and/or wrongful conduct, and had there been fair conduct in implementing the 1983 Contract and in determining WACOG." (¶ 41).
"The direct and proximate result of these breaches of duty to properly calculate the WACOG and to deal in good faith has been to increase the WACOG costs of gas in the 1983 Contract, and in turn, directly increase by the amount of those *19 wrongful WACOG manipulations the price that Plaintiffs and the class pay for natural gas." (¶ 46).
Defendants submit that these allegations establish that the relief plaintiffs demand while couched in legal buzzwords such as antitrust violations, breach of contract, and damage claimsis reparation for overcharges in the amount of the inflated, LPSC-approved rate, resulting from defendants' manipulation of the WACOG and PGA filings. Defendants submit that for plaintiffs at the same time to deny that they are challenging the reasonableness of the LPSC-approved rates is incongruous.
Defendants next argue that the court of appeal erred in failing to find that the LPSC's constitutional and statutory jurisdiction, summarized above, subsumes all of plaintiffs' claims. More particularly, defendants argue that plaintiffs' claims can be capsulized into three categories of conduct: (1) manipulation of the WACOG by inclusion of improper costs and exclusion of proper credits, (2) execution and implementation of the 1983 Contract, and (3) diversion of cheap gas to the Affiliate Corporations. Defendants link each of these categories of conduct with the relevant statutory provisions: First, the LPSC regulates the inclusion or exclusion of costs in or from WACOG under LSA-R.S. 45:302, 1163, and 1176. Second, LSA-R.S. 45:1176 authorizes the LPSC in setting rates to investigate the reasonableness and justness of all contracts entered into by public utilities, including the 1983 Contract, and charges paid by public utilities, including the alleged manipulation of charges under the 1983 Contract. And, third, LSA-R.S. 45:303 authorizes the LPSC in setting rates to take into account the prejudicial effect of direct industrial sales on consumer rates; more specifically, this statute provides that the LPSC's authority to regulate distribution companies' rates encompasses examining the relationship between the rates charged to residential and commercial customers and the prices paid by industrial customers to ensure that the residential and commercial customers are not prejudiced by unreasonably low industrial prices. Sugar Bowl Gas Corp. v. Louisiana Public Service Comm'n, 354 So.2d 1014, 1017 (La.1978). Hence, defendants maintain that all of plaintiffs' claims fall within the ambit of the LPSC's exclusive jurisdiction.
In the alternative, defendants argue that if the LPSC lacks exclusive jurisdiction, the doctrine of primary jurisdiction mandates that the district court defer this matter to the LPSC for its decision, as this is a matter requiring the LPSC's expertise and over which uniformity is needed.
Conversely, plaintiffs, supported by the lower courts and the Louisiana Attorney General appearing as amicus curiae, insist that this is not a rate case.[20] While plaintiffs do not dispute the sweeping scope of the LPSC's regulatory jurisdiction over rate making, they insist that their claim is not that defendants failed to comply with the LPSC-approved rate or orders. Plaintiffs emphasize that they never argue that they were charged a rate that differed from the LPSC-approved rate (WACOG plus $0.13 per mcf) and that they concede defendants presumably did comply with such rate. However, as noted above, plaintiffs take issue with the district court's statement that the LPSC "approved" the monthly WACOG and PGA filings and contend that the sole basis for this statement is defendants' unsupported factual representation. Plaintiffs contend that these filings are simply the triggering event that results in the increase (or decrease) in WACOG going into effect and that defendants' *20 purported compliance with the self-reporting requirements by filing monthly reports cannot constitute approval. Indeed, plaintiffs point out that the LPSC concedes in its brief to this court that its review of these filings is ministerial in nature and that its mere acceptance of these filings is sufficient to trigger the increase (or decrease) in WACOG.
Regardless of whether the LPSC "approved" these WACOG and PGA filings, plaintiffs contend that the cost adjustments passed on through these filings are not rates. In support of this contention, plaintiffs posit that since these filings were never the subject of a full LPSC deliberation, the costs adjustments passed on through them do not meet the constitutional requirement that the LPSC "render a full decision on each application, petition, and proposed rate schedule." La. Const. Art. IV, § 21(D)(2). It follows then, plaintiffs maintain, that the cost adjustments made pursuant to these WACOG and PGA filings are not rates and that their claims that the defendants manipulated such filings are not rate matters, but legal matters within the district court's original jurisdiction.
Plaintiffs further argue that the LPSC, by definition, lacks original jurisdiction over this matter as for a tribunal to have jurisdiction, it must possess the power not only to decide the dispute, but also to grant the relief to which the parties are entitled. LSA-C.C.P. Art. 1. Plaintiffs maintain that the LPSC clearly lacks the power to award the damages, much less the treble antitrust damages, to which they are entitled. In support of this position, plaintiffs cite City of New Orleans v. United Gas Pipe Line Co., 438 So.2d 264 (La.App. 4th Cir.), writ denied, 442 So.2d 463 (La. 1983) ("CNO I"), in which the LPSC's request to intervene in a class action brought by NOPSI customers was denied. Particularly, plaintiffs rely on the following language in that case: "[LPSC] seeks to substitute its own judgment for that of the trial judge in awarding and allocating damages. Such action, if allowed, would constitute a dangerous precedentan untenable usurpation and encroachment of the judicial function." CNO I, 438 So.2d at 266.
Besides the inability to award monetary damages, plaintiffs list several other things that the LPSC cannot do: (1) award the injunctive and declaratory relief sought, (2) entertain a class action, (3) order retrospective rate relief, and (4) exercise jurisdiction over the unregulated defendantsthe Affiliate Corporations. Plaintiffs contend that the LPSC's inability to do these things renders the exhaustion of administrative remedies rule (exclusive jurisdiction) inapplicable since initial resort to the LPSC would be futile.
Alternatively, plaintiffs argue that, at best, their claims are ones over which concurrent jurisdiction exists between the courts and the LPSC; consequently, as stated in Magnolia Coal, supra, the question is whether the district court abused its discretion in declining to invoke the primary jurisdiction doctrine. Relying on South-West Utilities, supra, as counseling a court against deferring to the LPSC when presented with an antitrust claim, plaintiffs contend that the lower courts correctly concluded that deference under the primary jurisdiction doctrine is not warranted.
Plaintiffs still further argue, again supported by the lower courts and again citing South-West Utilities, supra, that the jurisprudence is clear that public utilities are not immune from the antitrust laws. In the same vein, plaintiffs contend that defendants' reliance on the filed-rate doctrine is misplaced because that doctrine was rejected long ago in Texas & P. Ry. Co. v. Railroad Comm'n of Louisiana, 137 La. 1059, 69 So. 837 (1915), as a federal concept not binding on Louisiana courts. Moreover, plaintiffs contend that even the federal courts have rejected the application of that doctrine when, as here, it is alleged that automatic fuel adjustment clauses have been fraudulently manipulated.

V.
At the outset, we note that defendants concede the correctness of the court of appeal's holding, based on South-West *21 Utilities, supra, that "the broad powers of the [L]PSC do not preempt Louisiana antitrust laws although rates may be affected." Daily Advertiser, 594 So.2d at 550. Defendants, however, contend that the Keogh or filed-rate doctrine confers on a public utility a limited form of immunity from antitrust claims by private plaintiffs based on commission-approved rates. We find defendants' reliance on the filed-rate doctrine misplaced; that doctrine does not preclude plaintiff-customers from challenging defendants' alleged manipulation of automatic fuel adjustment clauses.[21]
The seminal case enunciating the filed-rate doctrine is Keogh v. Chicago & Northwestern Railway Co., 260 U.S. 156, 43 S.Ct. 47, 67 L.Ed. 183 (1922), which held that a treble damage award is not an available remedy to a private plaintiff claiming that the rate submitted to, and approved by, a regulatory agency was the product of an antitrust violation. Square D Co. v. Niagara Frontier Tariff Bureau, Inc., 476 U.S. 409, 106 S.Ct. 1922, 90 L.Ed.2d 413 (1986). The Square D court clarified that this doctrine does not confer a form of antitrust immunity, but merely denies one form of relieftreble damagesto one class of plaintiffsprivate plaintiffs. This doctrine does not preclude other parties, such as the government, from bringing various kinds of actions. Nor does it preclude private plaintiffs from bringing actions for other types of relief, such as injunctive or declaratory relief. 9 Kintner & Bauer, Federal Antitrust Law § 65.3, p. 9 n. 27 (1989).
Applying this doctrine, courts across the nation have declined to adjudicate a wide spectrum of claims the resolution of which would require judicial second-guessing of rates charged pursuant to commission-approved tariffs.[22] Citing this line of jurisprudence, defendants argue that the filed-rate doctrine bars plaintiffs' claims, which, in essence, seek damages based upon the difference between the filed rate approved by the LPSC and some hypothetical rate that the LPSC would have approved but for the alleged wrongful manipulation of the WACOG and PGA filings. For the district court to predicate a damage award on the basis of the difference between the LPSC-approved rate and some hypothetical rate, defendants contend, would not only contravene the filed-rate doctrine, but also engage the court in rate making, a function constitutionally conferred exclusively on the LPSC.
While defendants' argument is, at first glance, appealing, it suffers from a fundamental flaw. The filed-rate doctrine does not preclude a party from challenging a utility's misapplication of its tariff. City of Cleveland, Ohio v. Federal Power Comm'n, 525 F.2d 845 (D.C.Cir.1976); East Tennessee Natural Gas Co. v. Federal Energy Regulatory Comm'n, 631 F.2d 794 (D.C.Cir.1980). As the City of Cleveland court observed:
The considerations underlying the [filed-rate] doctrine, however, are preservation of the agency's primary jurisdiction over reasonableness of rates and the need to insure that regulated companies charge only those rates of which the agency has *22 been made cognizant. We perceive no reason why the doctrine should be employed to render unmodifiable a rate which has been filed in breach either of authority or contract.

525 F.2d at 854 (emphasis supplied). Based on the above principles, the court in East Tennessee held that "[a]llowing a party to demonstrate that a natural gas company has misapplied the terms of its [PGA] tariff does not violate the filed rate doctrine." 631 F.2d at 800 n. 10.
Our finding that the filed-rate doctrine is inapplicable is reinforced by "the fact that fuel cost adjustment clauses are themselves unique animals that are not easily assimilated to classical rate-making principles." Maine Public Service Co. v. Federal Power Comm'n, 579 F.2d 659, 668 (1st Cir.1978). Consequently, issues regarding such clauses present unique policy questions rather than "black or white legal issues." Id. As the issue before us centers on automatic fuel adjustment clauses (LIG's WACOG and Trans-La's PGA), a brief overview of the history and operation of such clauses is warranted.

VI.
Automatic fuel adjustment clauses are widely-accepted rate making tools utilized to allow a utility to recoup fluctuating fuel costs on an ongoing basis. Schiffel, Electric Utility Regulation: An Overview of Fuel Adjustment Clauses, 95 Pub.Util. Fort. 23, 24 (1975).[23] Simply put, an automatic fuel adjustment clause is "a fixed rule under which future rates to be charged the public are determined. It is simply an addition of a mathematical formula to the filed schedules of the Company under which the rates and charges fluctuate as the wholesale cost of gas to the Company fluctuates." City of Norfolk v. Virginia Electric & Power Co., 197 Va. 505, 90 S.E.2d 140, 148 (1955).
Commissions employ such clauses when they encounter an item of expense, such as fuel costs, that tends to be more volatile in comparison to the utility's other costs. Southern California Edison Co. v. Public Utilities Comm'n, 20 Cal.3d 813, 144 Cal. Rptr. 905, 576 P.2d 945, 947 (1978). Such clauses permit fluctuations in the utility's costs to be passed through directly to its customers as cost adjustments in subsequent utility bills. Warren, Regulated Industries' Automatic Cost of Service Adjustment Clauses: Do They Increase or Decrease Cost to the Consumer?, 55 Notre Dame Law. 333, 336 (1980) ("Warren"). Such clauses thereby permit the utility to track its rates more closely to its current cost of fuel without continually having to file for rate increases (or decreases), ameliorating the regulatory lag problem inherent in the prospective nature of rate making. Public Service Co. of New Hampshire v. Federal Energy Regulatory Comm'n, 600 F.2d 944, 947 (D.C.Cir.), cert. denied, 444 U.S. 990, 100 S.Ct. 520, 62 L.Ed.2d 419 (1979); Gulf Power Co. v. Florida Public Service Comm'n, 487 So.2d 1036, 1037 (Fla.1986).[24]
Obfuscation arises regarding the nature of such clauses because "[a] rate that escalates is not a `rate' in the dictionary sense of the word, but is only a means of arriving at a rate." Ardery, Should There Be Rules about Escalator Clauses?, 53 Pub. Util.Fort. 35, 36 (1954) (hereinafter "Ardery"); *23 see Southern California Edison, 576 P.2d at 946.[25] This is best exemplified by the judicial characterization of such clauses as rate making for some purposes, but not for others.
Implementation of such clauses is an exercise by a regulatory commission of its rate making, as opposed to rule making, power. In re Petition of Allied Power & Light Co., 132 Vt. 354, 321 A.2d 7 (1974). Such clauses are generally adopted in a rate proceeding as an integral part of a utility's overall rate structure. Scates v. Arizona Corp. Comm'n, 118 Ariz. 531, 578 P.2d 612, 616 (1978); Public Service Co. of New Hampshire, 600 F.2d at 947 (describing such clauses as part of a "utility's filed rate"). While in a few jurisdictions regulatory commissions are statutorily authorized to implement such clauses, in Louisiana, as in most jurisdictions, the commission implements such clauses pursuant to its plenary rate making authority. See City of Chicago v. Illinois Commerce Comm'n, 13 Ill.2d 607, 150 N.E.2d 776, 782 (1958) (commission's rate making function includes the authority to make pragmatic adjustments); Trigg, Escalator Clauses in Public Utility Rate Schedules, 106 U.Pa.L.Rev. 964, 996 (1958) ("Trigg"); Note, Due Process and the Automatic Fuel Adjustment Clause, 52 Ind.L.J. 637 n. 3 (1977).
Conversely, the commission's allowance of monthly cost adjustments pursuant to such clauses does not constitute rate making in the traditional sense of that term because such adjustments go into effect without an antecedent reasonableness review and thus are not "commission-made" rates.[26] It follows then that the commission is not precluded by the rule against retroactive rate making from subsequently examining and modifying such adjustments.[27]
The California Supreme Court in Southern California Edison, supra, aptly articulated the reason why the commission's allowance of monthly cost adjustments pursuant to such clauses does not constitute rate making:
[I]n authorizing Edison every few months to adjust its rates by operation of the fuel [adjustment] clause, the commission was not engaging in ratemaking. Because the increased charges thus imposed were not products of ratemaking, they were not rendered inviolable by the rule against retroactive ratemaking. To put it another way, the commission's decision to further adjust those rates so as to compensate for substantial past overcollections may well be retroactive in effect, but it is not retroactive ratemaking.
576 P.2d at 954-55. In so doing, the California court also rejected the utility's characterization of such clauses as "miniature rate proceedings," pointing out that "the rates fixed by operation of the fuel cost *24 adjustment clause were not `general rates' but `extraordinary rates not created by or in a general rate proceeding.'" Id. at 955 n. 21; see also MGTC, Inc. v. Public Service Comm'n of Wyoming, 735 P.2d 103, 107 (Wyo.1987) (rule against retroactive rate making is limited to "general" rate making proceedings and does not apply to rate adjustments made pursuant to automatic fuel adjustment mechanisms).
The policy reason for not applying the rule against retroactive rate making in this context is that by allowing a utility to collect its fuel costs close to the time they are incurred and thereby ameliorate regulatory laga procedure implemented for the utility's benefitthe commission should not be held to have divested itself of jurisdiction to review such costs at a later time. MGTC, 735 P.2d at 107. As the MGTC court observed, "`[t]he specter of retroactive ratemaking must not be viewed as a talismanic inhibition against the application of principles based upon equity and common sense.'" 735 P.2d at 107 (quoting Roberts v. Narragansett Electric Co., 470 A.2d 215, 217 (R.I.1984)). Hence, "the requirement of fairness which compels adjustment in rates to compensate utilities for escalating fuel costs also compels retrospective reconciliation to exclude charges identifiably resulting from unreasonable computations or inclusions." Ohio Power Co. v. Public Utilities Comm'n, 54 Ohio St.2d 342, 376 N.E.2d 1337, 1338-39 (1978); See also Richter v. Florida Power Corp., 366 So.2d 798, 801 (Fla.App. 2 Dist.1979).
Similarly, the court in East Tennessee, supra, instructed that "[t]he rule against retroactive ratemaking only requires that natural gas companies, the Commission, and courts abide by an administrative determination (including any modifications on judicial review) that a particular rate is just and reasonable. It does not prohibit the Commission from ordering a company to honor its tariff when the tariff itself calls for an adjustment." 631 F.2d at 800; see also MGTC, supra. As a result, "`[t]he future reduction of fuel clause adjustment rates is not retroactive ratemaking,' even though designed `to reflect past over- or under-collections.'" Southern California Edison, 576 P.2d at 955 n. 21. In short, such clauses are "unique animals," falling outside the parameters of the rule against retroactive rate making. Maine Public Service, 579 F.2d at 668; see also Gulf Power Co., 487 So.2d at 1037; Public Service Comm'n v. Delmarva Power & Light Co. of Maryland, 42 Md.App. 492, 400 A.2d 1147, 1153 (1979).
As their name implies, fuel adjustment clauses are not designed to allow the utility to earn a profit; rather, they are recoupment devices designed to permit a dollar-for-dollar recovery of fluctuations in fuel costs. Southern California Edison, 576 P.2d at 947; Ardery, supra at 37; Warren, supra at 336 ("the utility neither profits nor loses money from the increased cost.") The customer is harmed by the implementation of such clauses only if, as alleged here, such clauses are manipulated or abused. Nonetheless, criticism has been voiced against the use of such clauses because of their automatic nature. Fowler, Purchased Gas Adjustment Clauses: An Adjuster's Viewpoint, 6 St. Mary L.J. 567 (1974) (hereinafter "Fowler").[28] The criticism is that "`[s]uch clauses are basically an abdication of the legislative regulatory authority which is the only protection standing between the consumer and unbridled monopoly power.'" Comment, The Fuel Adjustment Clause and its Role in the Regulatory Process, 47 Miss.L.J. 302, 303 (1976); Trigg, supra at 966.
The criticism is overcome by the commission's necessary retention of jurisdiction to review and determine whether costs passed on through such clauses are just and reasonable and thus prudently incurred by the utility. Niagara Mohawk Power Corp. v. Public Service Comm'n of *25 State of New York, 69 N.Y.2d 365, 514 N.Y.S.2d 694, 698, 507 N.E.2d 287, 291 (1987).[29] Indeed, as one commentator points out, "even a completely automatic clause does not surrender any of the commission's regulatory powers. Authority to investigate the reasonableness of a rate is always retained." Foy, Cost Adjustment in Utility Rate Schedules, 13 Vand.L.Rev. 663, 672 (1960); see also Fowler, supra at 568. By implication, the commission's ongoing authority to investigate fuel cost adjustments passed on through such clauses includes the power, when necessary, to take corrective measures and to order refunds for charges not prudently incurred; "the power to order refunds must be implied, for there is little purpose in reviewing fuel adjustment charges, and the consumers interests are ignored, if corrective action is not authorized for imprudent expenditures automatically passed through to the ratepayers." Niagara, 514 N.Y.S.2d at 698-99, 507 N.E.2d at 291-92; see also Delmarva, 400 A.2d at 1153; Gulf Power Co., 487 So.2d at 1037.
The commission's jurisdiction comes into play when, as here, manipulation or abuse is alleged. To invoke the commission's jurisdiction, "any person who believe[s] the rates as increased by escalation to be unreasonable [may] file a complaint with the Commission." Trigg, supra at 970. Attempts by customers to circumvent the commission's jurisdiction by challenging the manipulation of such clauses in court have been rejected in the following trilogy of cases: Richter v. Florida Power Corp., 366 So.2d 798 (Fla.App. 2 Dist.1979); Florida Power Corp. v. Zenith Industries Co., 377 So.2d 203 (Fla.App. 2 Dist.1979), cert. denied, 388 So.2d 1120 (Fla.1980); and Daaleman v. Elizabethtown Gas Co., 77 N.J. 267, 390 A.2d 566 (1978). We briefly summarize these cases below.
Richter, supra, was a class action by customers alleging that they had been charged excessive electrical rates as a result of an illegal scheme through which Florida Power artificially inflated its fuel costs and passed such increases onto its customers through its fuel adjustment clause. Dismissing the action, the Florida appellate court held that this was a rate matter within the exclusive jurisdiction of the Florida Public Service Commission ("PSC"), opining: "the PSC is best equipped to investigate the consumers' allegations, and, if necessary, to establish the mechanism whereby refunds could be made to the thousands of consumers affected." 366 So.2d at 801. The Richter court, however, emphasized the limited nature of its holding. The court noted that the sole damages sought by the class were overcharges and declined to pass upon whether the result would be different in a customer's suit seeking damages other than overcharges, such as consequential damages. 366 So.2d at 799 n. 2. That issue was squarely presented in Zenith, supra, a subsequent case brought by the same utility's customers for damages arising out of the same alleged illegal scheme.
In Zenith, as in the case before us, the customers alleged an entitlement to damages other than overcharges; namely, the customers alleged an entitlement not only to general damages (which the court found would be encompassed in overcharges and thus be awarded by the PSC), but also to special and exemplary damages. 377 So.2d at 205. In resolving the issue left unanswered by Richterthe effect of the inclusion in the petition of allegations seeking damages other than overchargesthe Zenith court essentially bifurcated the case. Following Richter, it held that the overcharge aspect of the case was within the PSC's exclusive jurisdiction, opining "jurisdiction to determine and award refunds of *26 the alleged overcharges does not lie in the court but in the Florida Public Service Commission." 377 So.2d at 204. As to the remaining aspect of the casethe allegations seeking damages other than overchargesthe court held that the customers' entitlement to damages other than overcharges, and the amount thereof, would have to be determined by the trial court in light of the PSC's determination. Concluding, the court found that since "[t]he respective rights and liabilities of the parties, together with the type and amount of any recoverable damages, [would] be materially affected by the final result in the PSC proceedings," a stay of the trial court action was warranted pending completion of the PSC proceeding. Id. at 204.
The final trilogy case, Daaleman, supra, cited by defendants and amici, is particularly instructive. Daaleman, supra, was a class action brought by a ratepayer against a gas company regulated by the New Jersey Board of Public Utility Commissioners ("PUC"). The plaintiff-class contended that the defendant-utility fraudulently manipulated its PGA clause so as to overstate the actual cost and quantity of gas purchased and that it reflected these overstatements in its monthly customer bills. As redress, the plaintiff-class sought treble damages, attorney's fees and costs under the New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1, et seq. In finding the action within the PUC's exclusive jurisdiction, the New Jersey Supreme Court stressed the nature of the PGA clause at issue:
[A] Purchased Gas Adjustment Clause is a tariff mechanism, permitted under PUC's administrative order. Application of the clause involves interpretation of the PUC administrative order and regulations. Its use is subject to PUC supervision and control. Misuse of this type of clause, whether intentional or otherwise, and the remedies therefor are matters as to which PUC has been vested with exclusive jurisdiction.

390 A.2d at 569 (emphasis supplied). The Daaleman court also stressed that the PUC had instigated an investigation into the alleged manipulation of the PGA clause and that upon completion of the investigation the plaintiff-class would have an opportunity to present factual and legal contentions before the PUC.[30]
To summarize, automatic fuel adjustment clauses are an integral part of the rate making process, are subject to ongoing commission regulation, and can be adjusted retroactively by the commission to require the utility to refund overcharges to its customers. Applying these principles to the instant case, we conclude that plaintiffs' attempt to divorce amounts passed on through LIG's WACOG and Trans-La's PGA filings from the rate structure is unavailing; such fuel adjustment clauses are an integral component of rates. It follows then, as defendants contend, that this is primarily a rate matter within the LPSC's exclusive jurisdiction. It does not follow, however, as illustrated in Zenith, supra, and as discussed below, that plaintiffs are deprived of their right to seek damages other than overcharges in court.

VII.
Proper analysis and application of the primary jurisdiction doctrine and the exhaustion of administrative remedies rule (exclusive jurisdiction), relied upon by defendants, warrant that this judicial proceeding be dismissed in part, and deferred in part to the LPSC. Dismissal of plaintiffs' claims insofar as they arise out of the WACOG and PGA computations and seek reparation for overcharges is warranted because such claims are within the LPSC's exclusive jurisdiction and are subject to the requirement of exhaustion of administrative remedies. Deferral of the remainder of plaintiffs' claims seeking damages other than overcharges, while within the district court's original jurisdiction, to the LPSC is warranted by the primary jurisdiction doctrine. See Zenith, supra.
*27 The distinction between primary jurisdiction and the exhaustion rule (exclusive jurisdiction) is that primary jurisdiction applies when concurrent jurisdiction exists between the courts and the administrative agency; and the exhaustion rule applies when exclusive jurisdiction exists in the administrative agency, and the courts have only appellate, as opposed to original, jurisdiction to review the agency's decisions. Penny v. Southwestern Bell Telephone Co., 906 F.2d 183, 187 (5th Cir. 1990).[31] Concurrent jurisdiction exists in the district courts to adjudicate all legal matters, "except for those matters in which original jurisdiction is `otherwise authorized' by the constitution itself in other courts or in other adjudicative tribunals." Moore, 567 So.2d at 79 (citing La. Const. Art. V, § 16(A)). One such matter constitutionally subtracted from the district court's original jurisdiction and authorized in the LPSC is a rate matter. Id.[32] Exclusive jurisdiction over rate matters thus exists in the LPSC, and the courts have only appellate, as opposed to original, jurisdiction to review the LPSC's decisions.
Our conclusion that plaintiffs' claims for overcharges resulting from the manipulation of the WACOG and PGA filings are rate matters within the LPSC's exclusive jurisdiction is buttressed by three factors: first, any overcharges were passed onto plaintiff-customers through the regulatory process over which the LPSC has exclusive jurisdiction, see City of New Orleans v. United Gas Pipe Line Co., 517 So.2d 145, 179-80 (La.App. 4th Cir. 1987), cert. denied, 488 U.S. 917, 109 S.Ct. 273, 102 L.Ed.2d 262 (1988) ("CNO II") (holding that LPSC had authority over disposition of damage award since the pass-through of overcharges to LP & L's customers was accomplished through the LPSC-regulatory process); second, the judicial and scholarly authorities, set forth above, which recognize the commission's ongoing responsibility to oversee the operation of such clauses and to remedy any manipulation or misuse of them; and third, the trilogy of cases, which holds that the commission has exclusive jurisdiction over challenges that such clauses have been manipulated or otherwise abused.
Similar to the trilogy of cases, which rejects attempts by parties to circumvent the commission's ongoing jurisdiction over fuel adjustment clauses, a line of Louisiana cases has uniformly rejected semantic endeavors by parties to circumvent the LPSC's exclusive jurisdiction over rate matters. Fremin's Food & Furniture, Inc. v. Teche Electric Cooperative, Inc., 545 So.2d 998, 1000 (La.1989) (finding dispute between electric cooperative and its members regarding electric service within LPSC's *28 jurisdiction); Aurora Properties, Inc. v. Louisiana Power & Light Co., 251 La. 880, 207 So.2d 356, 359 (1968) (holding that determination of who should bear cost differential between underground and overhead lines could be "equated with" a rate determination which could not be decided by a court); Shreveport Laundries, Inc. v. Southern Cities Distributing Co., 176 La. 994, 147 So. 56, 57 (1933) (dismissing claim against utility for alleged overpayment resulting from method utility used in calculating its rates); Milstead v. Louisiana Power & Light Co., 581 So.2d 1085, 1086 (La.App. 2d Cir.), writ denied, 587 So.2d 697 (La.1991) (dismissing plaintiff's contractual claim which alleged rate overcharges); O'Niell v. Louisiana Power & Light Co., 558 So.2d 1235, 1237 (La.App. 1st Cir.1990) (holding that courts lack jurisdiction to alter rates or charges established by LPSC); Edwards v. Louisiana Power & Light Co., 439 So.2d 442, 443 (La.App. 1st Cir.1983) (holding dispute over whether defendant was charging in excess of tariff filed with LPSC is for LPSC to decide).[33]
In so doing, Louisiana courts have adopted a bifurcation approach similar to the one crafted in Zenith, supra, confining the dismissal to the rate claims and reserving the plaintiff's right to assert other types of damage claims, if any, in court. Fremin's Food, supra (reserving legal rights, if any, to damages); Milstead, supra (reserving plaintiff's right to assert claim for damages otherwise arising out of contract in district court); Edwards, supra (remanding plaintiff's claims for damages to lower court); see also O'Niell, supra (finding jurisdiction over, and adjudicating, claims requiring interpretation of certain contracts for electrical service). We find that the exhaustion rule and the primary jurisdiction doctrine warrant the application of such an approach in the instant case.

VIII.
The exhaustion rule is best described as a balancing test, requiring courts to weigh the relevant factors pulling for and against the desirability of requiring exhaustion and to make a discretionary decision based on preliminary observations. Magnolia Coal, 576 So.2d at 487-88 (Dennis, J. concurring) (citing 4 Davis, Administrative Law Treatise § 22.1 (2d Ed.1983) ("Davis")). Nevertheless, the following relevant factors pulling for and against exhaustion have been identified:
Pulling away from requirement of exhaustion are combinations of such factors as irreparable injury to a party from pursuing the administrative remedy, clear absence of the agency jurisdiction, clear illegality of the agency's position, a dispositive question of law peculiarly within judicial competence, the futility of exhaustion, and expense and awkwardness of the administrative proceeding as compared with inexpensive and efficient judicial disposition of the controversy.
Pulling toward exhaustion are combinations of such factors as the need for factual development, importance of reflecting the agency's expertise or policy preferences in the final result, probability that the agency will satisfactorily resolve the controversy without judicial review, protection of agency processes from impairment by avoidable interruption, conservation of judicial energy by avoiding piecemeal or interlocutory review, and providing the agency the opportunity to correct its own errors. *29 Id. at 488 (emphasis supplied) (citing Davis, § 26.1).
Pulling away from the requirement of exhaustion, plaintiffs strongly urge, is the futility of exhaustion. Plaintiffs' futility argument, as noted at the outset, is based on a laundry list of things they contend the LPSC cannot do: (1) award monetary, injunctive and declaratory relief; (2) entertain a class action; (3) order retrospective rate relief; and (4) exercise jurisdiction over unregulated entities. We address each of these briefly.
First, plaintiffs' contention that the LPSC lacks the authority to render the relief requested is based on CNO I, supra, which they cite for the position that the determination of damages is strictly a judicial function. Moreover, plaintiffs make a valiant attempt to equate themselves with the class of NOPSI-ratepayers in that case. We find plaintiffs' reliance on CNO I, supra, misplaced; that case is distinguishable from the instant case in three significant respects. One, the alignment of the parties there was vastly different. In CNO I, the plaintiffs included the customers, the distribution company (NOPSI), and the regulatory agency (the City); whereas, in the instant case, only the customers are plaintiffs.[34] Two, the regulatory body at the time of the alleged conduct was not the LPSC, but the City; the City never asserted that it had jurisdiction over the matter, but instead joined as a party to the suit in both its individual and its regulatory capacity. CNO I, 438 So.2d at 266 n. 2. Conversely, the regulatory body in this case is the LPSC, which has not only intervened in this matter, but also asserted that it has jurisdiction over it. Three, the essence of the dispute in the CNO I case was the breach of an unregulated contract between the plaintiff-distribution company (NOPSI) and the defendant-pipeline (United). In contrast, the essence of the dispute in the instant case is LPSC-approved rates and a regulated contract, the 1983 Contract.
As to the LPSC's inability to entertain a class action, we readily reject plaintiffs' suggestion that merely because they have styled this suit as a class action they are entitled to proceed in court. See Klopp v. Commonwealth Edison Co., 54 Ill. App.3d 671, 12 Ill.Dec. 911, 370 N.E.2d 822, 825 (1977); Dvorkin v. Illinois Bell Telephone Co., 34 Ill.App.3d 448, 340 N.E.2d 98, 106 (1975). Likewise, we reject plaintiffs' contention that the LPSC is precluded by the rule against retroactive rate making from granting retrospective rate relief for any overcharges resulting from the alleged manipulation of the WACOG and PGA filings; as discussed above, that rule is simply inapplicable to automatic fuel adjustment clauses. Finally, while plaintiffs are correct that the LPSC lacks jurisdiction over the unregulated defendants (the Affiliate Corporations), it possesses jurisdiction to regulate any prejudicial effects that affiliate transactions may have on plaintiffs' rates. LSA-R.S. 45:303; Sugar Bowl Gas, supra; see also Central Louisiana Electric Co., Inc. v. Louisiana Public Service Comm'n, 373 So.2d 123 (La.1979). Thus, plaintiffs reliance on the futility of exhaustion factor is misplaced.
Another factor on which plaintiffs rely as pulling against the requirement of exhaustion is the alleged clear absence of jurisdiction in the LPSC to render money judgments. We rejected a similar contention in Dixie Electric Membership Cooperative v. Louisiana Public Service Comm'n, 509 So.2d 1002 (La.1987), holding that "[t]he broad authority of the Louisiana Public Service Commission, stipulated in La. Const. art. 4, § 21(B) include[s] the power to order refunds. See Louisiana Power and Light Co. v. Louisiana Public Service Commission, 377 So.2d 1023 (La. 1979)." 509 So.2d at 1007 n. 11; see also CNO II, 517 So.2d at 179-80. In so doing, *30 we distinguished the cases discussed below Parker Gravel Co. v. Louisiana Public Service Comm'n, 182 La. 524, 162 So. 64 (1935), Morrison Cafeteria of Louisiana v. Louisiana Public Service Comm'n, 181 La. 932, 160 So. 634 (1935), and Louisiana Power & Light Co. v. White, 302 So.2d 358 (La.App. 4th Cir. 1974), writs denied, 309 So.2d 338 (La. 1975)[35] explaining that "[t]hose cases do not bar the Public Service Commission from promulgating a refund order of general application pursuant to its plenary ratemaking jurisdiction." 509 So.2d at 1009.
Nonetheless, plaintiffs contend that they are not seeking a simple refund, but rather legal damages, including treble antitrust damages, which the LPSC lacks the power to award. In support of this contention, plaintiffs cite Parker Gravel, supra, for the proposition that the only money demand the LPSC can entertain is one for damages for violation of its orders fixing rates, classifications, rules or regulations. While plaintiffs concede that Parker Gravel involved the powers of the LPSC's predecessor under the prior constitution and statutes, they contend that the same holds true today under LSA-R.S. 45:1197. Moreover, plaintiffs cite Morrison Cafeteria, supra, for the proposition that even claims seeking a money judgment for refund of overcharges are not within the original jurisdiction of the LPSC because the power to render a money judgment is a judicial function.
The flaw in plaintiffs' argument is that it ignores the differentiation recognized by the jurisprudence between implementing the clear and unambiguous terms of a rate by awarding a money judgmenta judicial functionand interpreting or determining the reasonableness of a rate authorized by the LPSCan administrative function. White, 302 So.2d at 366-67 (contrasting Shreveport Laundries, supra, and Morrison Cafeteria, supra).[36] We find that plaintiffs' claims fit squarely within the latter category. Despite their protestations to the contrary, plaintiffs, by alleging the manipulation of automatic fuel adjustment clauses, are challenging LPSC-orders; as the Daaleman court noted, "[a]pplication of the [fuel adjustment] clause involves interpretation of the [commission's] administrative order and regulations." 390 A.2d at 569. Moreover, we note that when the interpretation of commission orders or regulations is at issue, Louisiana courts have invoked the exhaustion rule, requiring that "until the plaintiff has exhausted his available remedies before the commission, he cannot resort to the courts." Shreveport Laundries, 147 So. at 57 (collecting cases); see also Steeg v. Lawyers Title Insurance Corp., 329 So.2d 719, 722 (La. 1976).
Having rebutted the factors identified by plaintiffs as pulling away from requiring exhaustion, we now identify the factors we find pull strongly toward exhaustion. First, there is a clear presence of jurisdiction in the LPSC, and lack of jurisdiction in the courts, over plaintiffs' claims insofar as they relate to the WACOG and PGA filings. Second, as established above, requiring exhaustion would not be futile; rather, the LPSC has the power to review these filings to determine if overcharges were made, and, if appropriate, to order refunds or fashion other appropriate remedies. Third, while this case cannot be resolved *31 without further factual development, the LPSC has the authority to utilize comparable procedural and discovery devices to those utilized by the courts, including the authority to compel the attendance of witnesses and the production of documents, and to take testimony. See LSA-R.S. 45:1184 and 1186.[37] Finally, the WACOG and PGA calculations at issue are matters peculiarly within the LPSC's competence and expertise.
Three other general principles support our finding that exhaustion should be required here. One, exhaustion is generally required when the agency has arguably approved the challenged conduct (as defendants argue the LPSC has done here) because the agency is better equipped to determine the intended effect of its prior approval. 1 Areeda & Turner, Antitrust Law ¶ 225 at 167 (1978); see also Mazzola v. Southern New England Telephone Co., 169 Conn. 344, 363 A.2d 170, 174-75 n. 7 (1975). Two, exhaustion is generally required to adjudicate questions concerning the rates of a public utility where, as here, constitutional or statutory provisions vest such determinations within the commission's jurisdiction. 73B C.J.S., Public Utilities § 100 (1983). Three, "disputes as to matters within the administrative regulation and expertise should ordinarily first be addressed for determination to the administrative tribunals legislatively intended to decide them, rather than to the courts." Steeg, 329 So.2d at 722.
Our conclusion that the exhaustion rule applies, however, does not mean that plaintiffs are deprived of their right to adjudicate their legal claims for damages other than overcharges in court. While we agree with defendants that merely alleging legal claims such as antitrust and breach of contract is not sufficient in every case to override the exhaustion of remedies requirement and confer jurisdiction in the courts and while we express no opinion on the merits of plaintiffs' other claims, we cannot ignore the presence in plaintiffs' petition of the prayer for damages other than overcharges. See Zenith, supra. Notwithstanding, as defendants urge, that the thrust of plaintiffs' petition is that they were overcharged by defendants' manipulation of the WACOG and PGA filingsmatters within the LPSC's exclusive jurisdiction plaintiffs are entitled to the adjudication of the remainder, if any, of their claims over which jurisdiction in the district court is proper. See Fremin's Food, supra; Milstead, supra; Edwards, supra.[38] Nevertheless, we find the doctrine of primary jurisdiction compels that such judicial determination be deferred until after the LPSC proceeding is completed.

IX.
The use of the doctrine of primary jurisdiction to resolve the problem presented here of a matter that presents issues falling within the jurisdiction of both the LPSC and the district court was recognized in CLECO, supra:
In some cases it is very difficult to determine whether the relief demanded by the parties presents issues for court resolution or agency resolution, and some cases present both. Under such circumstances the court in which an exception of lack of subject matter jurisdiction is filed may consider the doctrine of primary jurisdiction.
601 So.2d at 1388 (emphasis supplied) (Lemmon, J. concurring); see also Jaffe, Primary Jurisdiction, 77 Harv.L.Rev. 1037, 1038 (1964). While the lower courts considered this doctrine, they declined to invoke it, relying on South-West Utilities, supra. *32 Contrary to the lower courts, we find South-West Utilities, supra, supports the application of this doctrine here.
In South-West Utilities, the court declined to invoke this doctrine as the plaintiffs were competitors, and the dispute before it was not a rate matter. In stark contrast, plaintiffs in this case are customers, and the dispute before us is primarily a rate matter. Significantly, while finding the doctrine inapplicable to the facts before it, the South-West Utilities court directly addressed the appropriateness of applying the doctrine to rate matters:
We can easily appreciate in matters involving the determination of fair rates and services, in order that regulated industries may reasonably prosper and expand without taking undue advantage of monopolistic situations, that the Public Service Commission is eminently more qualified to make such decisions in contrast to the courts. This is necessarily so due to the integral association that this Commission has with these industries and the resulting inevitable familiarity with the specific and unique problems such industries encounter. It would indeed be an inefficient use of the courts and the Commission not to have the benefit of the Commission's expertise in such instances. Furthermore, the need for uniformity in rates dictates by the very essence of its nature a result that could not be otherwise.
339 So.2d at 429.
We find the factors identified in South-West Utilities, supra, as warranting the application of the doctrine of primary jurisdiction present here. The WACOG and PGA filings at issue are rate matters over which there is a need for uniformity. And, the LPSC's special administrative expertise resulting from its intimate working associations with the industry will be required to wade through and decipher the complex filings at issue. Thus, we hold that the lower courts abused their discretion in failing to invoke the doctrine of primary jurisdiction.

X.
Accordingly, we conclude that the district court erred in failing to maintain defendants' declinatory exception of lack of subject matter jurisdiction in part. To the extent plaintiffs' claims arise out of LIG's WACOG and Trans-La's PGA filings and seek reparation of overcharges, they are within the LPSC's exclusive jurisdiction. The exception of lack of subject matter jurisdiction is sustained as to those claims, and they are hereby dismissed. As to the remainder of plaintiffs' claims seeking damages other than overcharges, we do not dismiss, but rather remand the action to the Fifteenth Judicial District Court and stay the proceedings there pending the completion of proceedings in the LPSC, either as presently instigated or as may be instigated or supplemented by plaintiffs in the LPSC.
REVERSED AND RENDERED IN PART; REMANDED AND STAYED IN PART.
NOTES
[*] Judge Melvin A. Shortess of the First Circuit Court of Appeal sitting in place of Justice Cole, and Chief Judge Charles A. Marvin of the Second Circuit Court of Appeal sitting in place of Justice Watson, recused.
[1] An automatic fuel adjustment clause is "a device to permit rates to adjust automatically, either up or down, in relation to fluctuations in certain, narrowly defined, operating expenses. See generally, Foy, Cost Adjustment in Utility Rate Schedules, 13 Vand.L.Rev. 663 (1960); Trigg, Escalator Clauses in Public Utility Rate Schedules, 106 U.Pa.L.Rev. 964 (958); Note, Due Process Restraints on the Use of Automatic Adjustment Clauses in Utility Rate Schedules, 18 Ariz.L.Rev. 454 (1976). Such clauses usually embody a formula established during a rate hearing to permit adjustment of rates in the future to reflect changes in specific operating costs, such as the wholesale cost of gas or electricity." Scates v. Arizona Corp. Comm'n, 118 Ariz. 531, 578 P.2d 612, 616 (1978). Simply put, such clauses permit utilities to pass through to their customers fuel costs as they are incurred, and thus the amount the customer pays for the utility service varies directly with the amount the utility spends to produce the service. Warren, Regulated Industries' Automatic Cost of Service Adjustment Clauses: Do They Increase or Decrease Cost to the Consumer?, 55 Notre Dame Law. 333 (1980).
[2] By amending petition, plaintiffs corrected a misnomer regarding The Daily Advertiser, averring that the correct identity of this defendant is Thomson Newspapers (Wisconsin), Inc., doing business as The Daily Advertiser and that the correct status of this defendant is as a division of Thomson Newspapers (Wisconsin), Inc.
[3] It is alleged that when the 1983 Contract was entered into, Trans-La and LIG were wholly owned subsidiaries of Celeron, Inc., and that thereafter Trans-La was spun off and became a division of Atmos Energy Corporation d/b/a Energas Company.
[4] Industrial sales are sales to industrial end users of natural gas making use of the gas in a manufacturing process, in contrast to sales to commercial and residential customers. As provided in LSA-R.S. 45:303, direct industrial sales are not regulated by the LPSC. However, the LPSC can consider the effect of such sales in setting the regulated rates charged by public utilities to residential and commercial end users, such as plaintiffs. LSA-R.S. 45:303; Sugar Bowl Gas Corp. v. Louisiana Public Service Comm'n, 354 So.2d 1014 (La.1978).
[5] Mcf means one thousand cubic feet of natural gas.
[6] See note 1, supra, for definition of an automatic fuel adjustment clause.
[7] This second componentthe allowance for return on equitypermits a utility to recover for its non-gas costs. The LPSC fixes this "base" portion of the rate periodically in rate proceedings, which are invoked by the utility filing a rate increase application.
[8] Briefly, a PGA clause is another type of automatic fuel adjustment clause that allows a local gas distribution company to automatically adjust the rates it charges its customers for variations in its costs of purchasing gas, so that it rates more nearly tract its actual costs.
[9] As discussed below, plaintiffs contest whether the LPSC actually "approved" the monthly WACOG and PGA filings.
[10] Plaintiffs allege that this is a proper venue as each defendant has some business contacts with Lafayette Parish (retains an office there, conducts business there, or has an agent there); much of the alleged wrongful conduct occurred there; and a substantial number of the class members reside or do business there.
[11] Defendants also removed this action to federal court. Finding that this matter involves exclusively state law claims and that diversity jurisdiction is lacking, the federal district court remanded.
[12] Defendants also filed a dilatory exception of vagueness. Additionally, Trans-La and T-Lig filed a declinatory exception of improper venue and dilatory exceptions of prematurity, lack of procedural capacity and improper cumulation of actions. The district court denied all of these exception, except for lack of procedural capacity which is still pending. While the court of appeal generally affirmed the denial of these other exceptions, we confine our review to the jurisdictional issue and thus do not address these other exceptions.
[13] LSA-R.S. 51:134 provides:

In all cases under this Part the defendant shall file all exceptions in limine litis, or if necessary in the alternative, after the usual delays, and any additional delays as the court may allow; however, a plea to the jurisdiction is not waived by other pleas or exceptions filed. The judge shall take up such exceptions in preference over all other business and shall decide all questions raised in the exceptions within ten days after submission, and his ruling shall have the effect of res judicata, unless the party cast shall appeal within five days. The appeal is returnable within ten days to the appellate court which shall hear and determine the case within forty days. If the exceptions are overruled by final judgment of the appellate court, the defendant shall file his answer covering all questions of controverted fact within fifteen days, and the case may be set for trial on the application of either party, which case the judge shall consider in preference over all other business.
[14] While plaintiffs contend that only their antitrust claim is before us, we find this argument unavailing. The procedural quirk in the court of appeal's jurisdiction resulting from the application of LSA-R.S. 51:134 does not extend to this court's jurisdiction. Rather, upon granting writs, the entire case is before this court. Broussard v. National Food Stores of La., Inc., 258 La. 493, 246 So.2d 838, 839 (1971) (collecting cases); Pitre v. Pitre, 248 La. 925, 183 So.2d 307 (1966); see Stetter, Louisiana Appellate Practice Handbook, § 8.10 (1989). Indeed, La. Const. Art. V, § 5(F), provides that "the supreme court has appellate jurisdiction over all issues involved in a civil action properly before it."
[15] The term "plenary" means "`full, entire, complete, absolute, perfect, unqualified.'" Comment, Louisiana's Constitutional Agencies: Plenary Powers or "Constitutional Illusions of Being a Fourth Branch of Government"?, 51 La.L.Rev. 875 n. 1 (1991) (quoting Black's Law Dictionary 1038 (5th ed. 1979)).
[16] LSA-R.S. 45:302 provides:

The commission shall supervise, govern, regulate and control the transportation or sale of natural gas moving by pipe line to local distribution systems for resale for the purpose of fixing and regulating the rates charged and the service furnished by such public utilities in connection with such transportation or sale.
The power, authority and duties of the commission shall affect and include all matters and things directly connected with, concerning and growing out of the service given or rendered by such pipe lines transporting or selling natural gas to local distributing systems for resale with respect to any such transportation or sales.
[17] In fact, plaintiffs concede in their brief to this court that the only Louisiana case they could locate directly addressing this issue is South-West Utilities, Inc. v. South Central Bell Telephone Co., 339 So.2d 425 (La.App. 1st Cir. 1976).
[18] Defendants' arguments are not limited to any particular claim, but rather are addressed to all of plaintiffs' claims. In this regard, defendants note that they filed a single exception of lack of subject matter jurisdiction, that all plaintiffs' claims are based on the same operative facts, and that plaintiffs' claims are integrally interwoven. Nonetheless, as plaintiffs primarily rely upon their antitrust claim and as that was the sole claim before the court of appeal, the discussion that follows may focus more significantly on the antitrust claim with the understanding that much of what is said also applies to the other state law claims. (See note 14, supra, rejecting plaintiffs' argument that only the antitrust claim is before this court.)
[19] The filed-rate doctrine, in its simplest form, provides that "[a utility] can claim no rate as a legal right that is other than the filed rate." Montana-Dakota Utilities Co. v. Northwestern Public Service Co., 341 U.S. 246, 251, 71 S.Ct. 692, 695, 95 L.Ed. 912, 919 (1951). The doctrine precludes claims that seek damages measured by the difference between the allegedly excessive filed rate and some theoretical reasonable rate that would or should have been approved absent the wrongful conduct. H.J., Inc. v. Northwestern Bell Telephone Co., 954 F.2d 485, 488 (8th Cir.), cert. denied, ___ U.S. ___, 112 S.Ct. 2306, 119 L.Ed.2d 228 (1992). Simply stated, this doctrine bars the use of a hypothetical rate in damage calculations. Id.; see Note, The Use of Hypothetical Rates in Antitrust Damages Calculations: Reforming the Keogh Doctrine, 38 Stan.L.Rev. 1141 (1986).
[20] Plaintiffs correctly depict a traditional "rate" case as one in which the LPSC issues an order, generally an order issued on a utility's application for a rate increase. From such an order (or any other order of the LPSC), an interested party may judicially appeal by commencing a direct action against the LPSC in its domicile (the Nineteenth Judicial District Court for the Parish of East Baton Rouge) within three months from the effective date of such order. LSA-R.S. 45:1192. In such case, judicial review is confined to a determination of whether the LPSC exercised its ratemaking authority arbitrarily, capriciously, or unreasonably. Central Louisiana Electric Co. v. Louisiana Public Service Comm'n, 508 So.2d 1361, 1364 (La.1987). Direct appeal from the Nineteenth Judicial District Court's decision in such cases is to this court. La. Const. Art. IV, § 21(E).
[21] In light of our finding that the filed-rate doctrine is inapplicable under the facts of the instant case, we leave for another day the question plaintiffs raise of whether that doctrine is alive and well in Louisiana. We likewise note, but decline to address, two similar arguments raised by defendants and amici; briefly stated, these other arguments are that: (1) since regulation takes the place of competition as between a utility and its customers, application of the antitrust laws in this context is inappropriate on policy grounds, State ex rel. Guste v. Council of City of New Orleans, 309 So.2d 290, 294 (La. 1975); and (2) since the antitrust laws are embodied in the revised statutes and the LPSC's regulatory jurisdiction is embodied in the constitution, it is axiomatic that constitutional provisions prevail over statutory provisions, State v. Franklin, 202 La. 439, 12 So.2d 211 (1943).
[22] See Square D, supra (antitrust action for treble damages by private party); Keogh, supra (same); Wegoland, Ltd. v. Nynex Corp., 806 F.Supp. 1112 (S.D.N.Y.1992) (federal RICO and state law fraud and negligent misrepresentation claims); H.J., Inc. v. Northwestern Bell Telephone Co., 954 F.2d 485, 488 (8th Cir.), cert. denied, ___ U.S. ___, 112 S.Ct. 2306, 119 L.Ed.2d 228 (1992) (federal RICO claim); Taffet v. Southern Co., 967 F.2d 1483, 1490 (11th Cir.), cert. denied, ___ U.S. ___, 113 S.Ct. 657, 121 L.Ed.2d 583 (1992) (same).
[23] Four pragmatic justifications have been identified for using such clauses:

"(1) to reduce the number of rate proceedings and the expenses attended thereon, (2) a series of smaller increases to the customer, (3) improved financial stability for the utility by reducing the variations in earnings caused by such increase in expenses, and as a result (4) a somewhat reduced cost of capital which ultimately would accrue to the benefit of the consumer."
Comment, Utility Rates, Consumers, and the New York State Public Service Commission, 39 Alb.L.Rev. 707, 754 (1975).
[24] As we have noted, "[r]regulatory lag is the loss of proper earnings claimed by a utility between the time a petition for a rate increase is filed and the rate relief actually becomes effective by administrative or judicial determination." Central Louisiana Electric Co. v. Louisiana Public Service Comm'n, 508 So.2d 1361, 1366 (La.1987); see also Louisiana Power & Light Co. v. Louisiana Public Service Comm'n, 523 So.2d 850, 856 n. 3 (La.1988).
[25] Unsurprisingly, judicial treatment of automatic fuel adjustment clauses has been dryly portrayed: "[a] lawyer who attempts to chop his way around in the jungle of legal opinion on the subject of these clauses is apt to find himself wandering in circles with his intellectual machete so dulled he is soon brought to a standstill." Ardery, supra at 39.
[26] "Commission-made" rates are "those rates which are implemented subsequent to an exhaustive evidentiary presentation of the utility's expenses and their reasonableness." Equitable Gas Co. v. Pennsylvania Public Utility Comm'n, 106 Pa.Cmwlth. 240, 526 A.2d 823, 830, appeal denied, 516 Pa. 644, 533 A.2d 714 (1987) (emphasis in original). The distinction between rates implemented pursuant to automatic fuel adjustment clauses and "commission-made" rates is that while the latter are the result of a full-fledged rate proceeding in which the reasonableness of all the utility's costs are reviewed, the former are implemented automatically with no antecedent reasonableness review. Id.
[27] We recently defined retroactive rate making as "occur[ring] when a utility is permitted to recover an additional charge for past losses, or when a utility is required to refund revenues collected pursuant to its lawfully established rates." South Central Bell Telephone Co. v. Louisiana Public Service Comm'n, 594 So.2d 357, 359 (La.1992) (collecting cases). We further noted that the underlying rationale for this rule is that "[a] commission-made rate furnishes the applicable law for the utility and its customers until a change is made by the Commission." Id. (emphasis supplied). As established above, the rates at issue here, however, are not "commission-made" rates and thus are not protected from subsequent review by the rule against retroactive rate making. Equitable Gas, supra.
[28] "An adjustment clause is automatic in the sense that the clause itself and the method for its calculation is found in the tariff sheet." Fowler, supra at 568. A tariff is "a published volume of rate schedules and general terms and conditions under which a product or service will be supplied." MGTC, Inc. v. Public Service Comm'n of Wyoming, 735 P.2d 103, 104 n. 1 (Wyo.1987) (citing 3 American Gas Association, Regulation of the Gas Industry, GL-158 (1981)).
[29] See also City of Chicago v. Illinois Commerce Comm'n, 13 Ill.2d 607, 150 N.E.2d 776, 781 (1958) (by authorizing automatic adjustment clause commission does not give up its right to initiate proceedings to determine the reasonableness of the utility's rates); Delmarva, 400 A.2d at 1152-53 (explaining that retention of jurisdiction is necessary to assure that charges passed on are reasonable because such clauses "contemplate complex formulas which must be tested against mathematical calculations from designated figures each month" and distinguishing necessarily ongoing process of verifying fuel adjustment clauses from the ordinary rate making process); Gulf Power Co., supra (describing such clauses as "ongoing processes").
[30] As noted elsewhere, the LPSC has instigated an investigation into LIG's WACOG and Trans-La's PGA filings.
[31] Another articulation of this distinction is as follows:

Primary jurisdiction, unlike the rule of exhaustion of administrative remedies which applies when a claim is cognizable in the first instance only in an administrative agency, applies when a claim is originally cognizable in a court. In exhaustion cases judicial proceedings are premature until the administrative process has been completed, while in primary jurisdiction cases the judicial process is suspended pending referral to the administrative agency of issues which under a regulatory scheme are within the agency's special competence. United States v. Western Pacific Railroad Co., 352 U.S. 59, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956).
CLECO, 601 So.2d at 1388 (Lemmon, J. concurring). We note that these terms have been described as confusing and are often used interchangeably. Penny, 906 F.2d at 187 n. 3; 1 Areeda & Turner, Antitrust Law ¶ 223h at 144 (1978); 6 Von Kalinowski, Antitrust Laws and Trade Regulation § 44A.01[1] at p. 44A-3 (1992) (describing these doctrines as "tools of less than surgical precision").
[32] Moore, supra, indicates that, as a matter of constitutional law, original jurisdiction over the regulation of public utilities in general and rates in particular has been carved out of the district court's jurisdiction and consigned to the LPSC: "the constitution itself provides expressly for original jurisdiction over certain claims to be exercised by the Public Service Commission." 567 So.2d at 79-80 n. 7. This subtraction from the court's jurisdiction of certain matters results in exclusive jurisdiction of such subtracted matters being vested in the agency and is to be contrasted with the typical situation in which "the creation of a new agency means the addition to the legal system of a new lawmaking and law applying authority, with no explicit subtraction from the previously-existing power of courts." 4 Davis, Administrative Law § 22.1, p. 81 (2d Ed.1983). In the latter context, the agency and courts each have concurrent jurisdiction. Id.; see also Magnolia Coal, 576 So.2d at 487 (Dennis, J. concurring).
[33] The underlying, albeit unexpressed, rationale behind the above line of cases is that "[w]here the essence of the claim is that a utility has charged too much for the service provided, the claim is for reparations[, i.e., refund of overcharges; conversely, w]here the essence of the claim is not that too much has been charged for service, but rather that the utility has done something else which has wronged the plaintiff, the claim is for ordinary damages." City of Chicago, ex rel. Thrasher v. Commonwealth Edison Co., 159 Ill.App.3d 1076, 112 Ill.Dec. 46, 513 N.E.2d 460, 463 (1987) (citing Klopp v. Commonwealth Edison Co., 54 Ill.App.3d 671, 12 Ill.Dec. 911, 370 N.E.2d 822 (1977)); see also Kazmaier Supermarket, Inc. v. Toledo Edison Co., 61 Ohio St.3d 147, 573 N.E.2d 655, 660 (1991) (noting that "[a]lthough the allegations of the complaint seem to sound in tort and contract law, it must not be forgotten that the contract involved is the utility rate schedule.")
[34] In this regard, we note that in the related case, CNO II, the Fourth Circuit, in addressing the NOPSI ratepayers' right of action, stated:

The first petition for damages was filed on behalf of the ratepayers and NOPSI together. NOPSI does not complain of sharing its recovery with the ratepayers, and United does not show any post-trial burden resulting from the arguably improper maintenance of the ratepayers' right of action.
517 So.2d at 151.
[35] See also Central Louisiana Electric Co. v. Pointe Coupee Electric Membership Corp., 182 So.2d 752, 758 (La.App. 1st Cir.1966) (holding that LPSC lacks authority to render a money judgment for ordinary damages, as that is a judicial function).
[36] To illustrate, we offer the following example considered in argument before this court: suppose that the fixed rate the utility was authorized to charge was $1.00, but the utility allegedly charged $2.00; this dispute, as conceded by counsel for the LPSC, would be cognizable in court. Such is not the case here, however, as plaintiffs are not challenging a fixed rate, but rather are challenging the variable WACOG and PGA components of LIG's and Trans-La's rates. See also 73B C.J.S., Public Utilities § 100 (1983) (citing Morrison Cafeteria, supra, and noting that "[g]enerally, a suit to recover back excessive charges paid to a public utility may be maintained without first proceeding before the commission, but such a suit is not maintainable where it would necessitate the fixing of a rate by the court.")
[37] See Comment, Louisiana's Constitutional Agencies: Plenary Powers or "Constitutional Illusions of Being a Fourth Branch of Government"?, 51 La.L.Rev. 875, 881-82 (1991) (noting that "the article V district court and the article IV [L]PSC, when acting within their respective `judicial sphere' has a comparable range of problems (`matters') and tools (rules, statutes, orders, etc.)").
[38] In so holding, we obviate the need to rule on whether plaintiffs' claims against the unregulated defendants fail to state a cause of action, as alleged by one of the defendants in its brief to this court. We note that "[i]f the claims are empty allegations [as defendant contends], they will be disposed of through other proper channels." Penny, 906 F.2d at 186 n. 1.